2020 IL App (1st) 180199
No. 1-18-0199

SECOND DIVISION
December 22, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 15746 |
| | ) | |
| JAIME CORNEJO, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | William T. O'Brien, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concur in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Jaime Cornejo, was charged by indictment with armed robbery. Following a jury trial, he was convicted of the lesser-included offense of aggravated robbery and sentenced to seven years' imprisonment. On appeal, Cornejo argues that (1) his conviction of the lesser-included offense of aggravated robbery violated due process because (a) his indictment did not set forth facts supporting a conviction of aggravated robbery and (b) the evidence at trial was not sufficient to support a finding of not guilty for armed robbery but guilty for aggravated robbery; (2) the State improperly (a) "humiliated" Cornejo in cross-examination by asking him to speculate as to the mental state of the complainants and (b) "improperly bolstered its witnesses' credibility"

by referencing prior consistent statements in closing arguments; and (3) the circuit court imposed an excessive sentence on Cornejo given the mitigating factors presented at Cornejo's sentencing hearing. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3                                  A. Cornejo's Indictment

¶ 4     Cornejo was charged by indictment with one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2014)) and two counts of aggravated unlawful restraint (*id.* § 10-3.1), following an incident in Chicago on August 9, 2014. Cornejo's armed robbery count alleged that Cornejo:

> "knowingly took property, to wit: shoes and United States currency, from the person or presence of Kevin Rodriguez, by the use of force or by threatening the imminent use of force and Jaime Cornejo carried on or about his person or was otherwise armed with a firearm ***."

Prior to trial, the State dismissed both counts of unlawful restraint.

¶ 5                                         B. Trial

¶ 6                                  1. The State's Witnesses

¶ 7     At trial, the State called Kevin Rodriguez (Kevin), who testified that he collected high-end gym shoes as a hobby, and he would sell his shoes when he did not want them anymore or had an extra pair. Kevin's friend, Jessie Vega, helped sell Kevin's shoes through "KREAM," a Facebook group in which shoe collectors buy and sell shoes. Vega would post a picture and description of the shoes on KREAM and would respond to any group members interested in purchasing the shoes. Then, Vega would inform Kevin of any proposed transactions and would give the potential buyer the phone number of Kevin's sister, Samantha Rodriguez (Samantha). Through Samantha's phone,

Kevin would discuss a price for the shoes and arrange a place and time to meet up. Kevin testified that he used Samantha's phone because he did not have a phone at the time.

¶ 8    The first transaction Kevin made through Vega on Facebook was in August 2014, when Kevin had Vega sell a pair of "Nike Air Jordan Gamma 11s" (Gamma 11's) for $250. The Gamma 11's carried a retail price of $190, not including taxes, and Kevin had worn them "a couple of times." The State presented a picture of the Gamma 11's to the jury, and Kevin confirmed that the picture reflected his "unusual" method of tying shoelaces. Eventually, Vega told Kevin that someone was interested in buying the Gamma 11's. The evidence at trial showed that the interested buyer was Cornejo. Vega gave Samantha's number to Cornejo. Then, Kevin texted Cornejo and unsuccessfully attempted to meet with Cornejo for about two days.

¶ 9    The State presented text messages between Kevin and Cornejo. Referring to the exhibit, Kevin testified that on August 8, 2014, he asked if he could meet up with Cornejo to sell the shoes, but Cornejo said he could not. Eventually, on August 9, 2014, at 10:57 a.m., Kevin texted Cornejo, asking whether he still wanted the Gamma 11's. Cornejo responded that he did, and the two arranged to complete the transaction around 5 p.m. Cornejo told Kevin that he was at "Belmont [Avenue] and Central Park [Avenue]."

¶ 10    Shortly before 5 p.m., Cornejo texted Kevin that he had $300 in total and asked if Kevin had change for $100. Kevin did not have the money at the time, so he texted Cornejo that he would get change. Once Kevin texted Cornejo that he was on his way, Cornejo texted, "All right, bro. I got a question for you, though, G. *** Better not be on bulls***, G, trying to rob me." Kevin responded that he was not trying to rob Cornejo and that he "was about to ask [Cornejo] the same thing." Cornejo responded, "Don't try pulling some s***. Feel me." Then, Kevin texted, "Last thing you got to worry about. Am I good around there, though? Don't want no problems either."

Cornejo texted, "Yeah, you're good G. When you get to Belmont and Central Park, you're going to go to Drake, then [turn] left, then right at [the] first alley, G."

¶ 11    Kevin got $50 from his grandfather, who lived with him and his sister, and Samantha drove Kevin towards the area. Kevin texted Cornejo that he would call when he was close. Cornejo responded, "[o]kay" but stated that he had to leave soon. Then, Kevin texted that his "GPS says 15 more minutes," and he asked Cornejo not to leave. Samantha drove the vehicle into the alley according to Cornejo's instructions. Kevin texted, "Here. Black car." Cornejo replied that he would be outside, and Kevin clarified that he was in the alley.

¶ 12    Eventually, at about 6:35 p.m. when it was still light outside, a man identified as Cornejo entered the alley from a gangway on Kevin's left side. Cornejo was wearing a black hat, dark shirt, and camouflage pants. Samantha drove the vehicle down the alley to the middle of the block so that Cornejo was behind the vehicle. Then, Kevin exited the vehicle with the $50 in his pocket and placed a shoe box containing the Gamma 11's on the trunk of the vehicle. Kevin and Cornejo said "what's up" to each other.

¶ 13    Cornejo removed the shoes from the box, examined them, and then placed them back in the box. He then pulled a firearm from his pocket and pointed it at Kevin from about three feet away. Kevin testified that the firearm was dark; had a skinny, three-inch-long barrel; and had a "round thing in the middle." However, Kevin also testified that he did not know what type of firearm it was, that he was unfamiliar with firearms, and that he had only previously seen firearms "on T.V. and on police officers."

¶ 14    Cornejo told Kevin to empty his pockets and said, "Just get back in the car and the shoes *** are [mine] now." Kevin stepped back into the passenger's seat. Then, Cornejo pointed the firearm towards the vehicle's right rear window and stated, "Drive or I'll shoot." Samantha drove

the vehicle down the alley, and Cornejo walked back into the gangway from which he had entered the alley.

¶ 15    Samantha stopped at a gas station and called the police. Police officers arrived about five minutes later and drove Kevin and Samantha around the alley where the robbery had occurred. The officers exited their vehicle and searched the premises but were unable to locate anyone. They returned to the gas station and more officers arrived and spoke with Kevin and Samantha. Then, Samantha remembered Cornejo had used his Facebook account to make the shoe transaction and showed the account to the police. The State presented a screenshot of Cornejo's Facebook account, which Kevin confirmed was the page that Samantha showed to the police. Kevin gave a description of Cornejo's name, height, weight, and apparel to the officers and told the officers what happened. The officers were unable to locate Cornejo, and Kevin and Samantha went home.

¶ 16    Later, on August 14, 2014, Kevin and Samantha were driven by their mother to a police station. Kevin spoke with a detective; his mother was present because he was 16 years old at the time. Kevin identified Cornejo from a photo spread. Then, on August 25, 2014, Kevin received a call from a Chicago police officer and was told Cornejo had been "apprehended." Kevin went to the police station with his mother and sister and was taken to a small room, where he was shown the Gamma 11's. Kevin knew they were the stolen pair because the laces were tied in Kevin's "unusual" style. The State presented multiple exhibits displaying the Gamma 11's from different angles.

¶ 17    On cross-examination, Kevin denied that he went by the nickname "Armani Rodriguez." Kevin also clarified that he had given Cornejo the $50 in his pocket when Cornejo pointed a firearm at him. On redirect examination, Kevin testified that at the police station, police officers took photographs of the Gamma 11's and then returned the shoes to Kevin.

¶ 18    Samantha Rodriguez testified in corroboration with her brother Kevin but added that she left the house with Kevin to sell the Gamma 11's at about 6 p.m or 6:30 p.m. When Samantha reached the alley where she was directed to drive to, she stopped the vehicle, and Cornejo appeared "halfway" down the alley one or two minutes later. Samantha testified that the person who appeared in the alley matched the photograph on the Facebook account that was used to arrange the shoe purchase with Kevin.

¶ 19    As Kevin exited the vehicle to sell the Gamma 11's to Cornejo, Samantha watched the transaction through the rearview mirror. She stopped watching and looked at her phone once Cornejo finished examining the shoes because "everything seemed normal." After about 30 to 40 seconds, however, Kevin reentered the vehicle and was "really quiet" and "red like he was very nervous." Samantha asked Kevin what was wrong, but Kevin remained silent. Cornejo then approached the back window of the passenger's side and bent down so that Samantha could see him pointing a firearm at her. Samantha clarified that she could see Cornejo's "face and *** hand," and she could only see the firearm's barrel and Cornejo's "hand on the trigger." She testified that she "automatically knew it was a gun," but she had only seen firearms on police officers at school and on social media. Samantha was silent for a few seconds, and Cornejo told her to "drive or he will shoot" her.

¶ 20    Samantha drove Kevin to a nearby gas station, and they called the police there. The State presented an audio recording of Samantha's call to the police. When the police drove Samantha and Kevin back to the alley, the police told Samantha that the house near the scene of the robbery was abandoned. Samantha confirmed that she later identified Cornejo from a photographic lineup in her mother's presence, and her mother was present because she was 17 years old. On August

25, 2014, Samantha went to the police station and was shown a picture of the Gamma 11's. Samantha knew the Gamma 11's were Kevin's because their shoelaces were tied in Kevin's style.

¶ 21    On cross-examination, Samantha clarified that when Cornejo pointed the firearm at her, all of the windows of Samantha's vehicle were "down all the way" and Cornejo's firearm was halfway inside the vehicle and pointed at Samantha's head.

¶ 22    Chicago Police Department Detective Soto testified that on August 9, 2014, at about 6:40 p.m., he worked as a Chicago police officer and was on shift with his partner, Officer Vega.[1] Soto and Vega received a call that a robbery had occurred and arrived at a gas station on the intersection of Belmont Avenue and Kimble Avenue. There, they met with Kevin and Samantha, who described the details of a robbery and what the offender looked like. Kevin and Samantha entered Soto's vehicle and directed Soto to the 3500 block of Melrose Avenue, and they toured the area in search of the offender. They arrived at the alley where Kevin said the incident had occurred, and Soto exited his vehicle and entered the yard of a vacant residential property. Soto broadcast information regarding the incident over the radio and took Kevin and Samantha back to the gas station.

¶ 23    Chicago Police Department Officer Sean Marjham testified that on August 25, 2014, at about 6 a.m., he learned that Cornejo had been identified in a photographic spread as the offender in a robbery and a detective wanted Marjham to arrest Cornejo. At about 7:05 a.m., they arrived at the 2700 block of North Ridgeway Avenue wearing plainclothes and driving an unmarked vehicle. There, they saw Cornejo exit the front door of a building wearing "a pair of black Nike Air Jordan gym shoes that [Marjham and his partner] thought might be proceeds from the robbery." The officers arrested Cornejo, transported Cornejo to the police station, and recovered and

---

[1]The first names of Soto and Vega do not appear in the transcript of the trial proceedings.

inventoried the shoes Cornejo was wearing. They then contacted Kevin and Samantha, who arrived at the station. Kevin was shown the inventoried shoes and confirmed that the shoes were his Gamma 11's. An evidence technician took photographs of the Gamma 11's, and the Gamma 11's were returned to Kevin.

¶ 24    Chicago Police Department Detective Ralph Benavides testified that in the afternoon of August 11, 2014, he interviewed Samantha by telephone with the permission of Samantha's mother. On the night of August 14, 2014, Kevin and Samantha went to the police station with their mother to be interviewed and view a photo spread. Kevin and Samantha were each taken into a conference room separately, and in the presence of their mother and Benavides, they each identified Cornejo as the offender from the photo spread. During Samantha's interview, Samantha showed Cornejo's Facebook profile to Benavides from a computer and she retrieved photographs of text message exchanges with Cornejo. Benavides inventoried the photographs of the text messages. On cross-examination, Benavides confirmed that no firearm or fingerprints were ever located during the investigation of the robbery.

¶ 25    The State entered into evidence by stipulation that Cornejo's mother was the registered subscriber of the cellular phone number used to contact Samantha's phone regarding the purchase of the Gamma 11's. The State also entered by stipulation that Cornejo maintained "sole possession" of the cellular phone with that number and was the phone's sole user.

¶ 26    The State rested.

¶ 27                                    2. Cornejo's Testimony

¶ 28    Cornejo testified on his own behalf. He stated that in the summer of 2014, he used Facebook and belonged to the Facebook group KREAM. Cornejo saw the Gamma 11's posted for sale on KREAM and left a comment on the post asking for their price. He was told the seller's

name was "Armani Rodriguez," but later learned his name was Kevin Rodriguez. Cornejo believed he was communicating directly with Kevin.

¶ 29    Cornejo first attempted to meet with Kevin at Cornejo's mother's house, but the attempt failed because Kevin's girlfriend was unable to give Kevin a ride. On August 8, 2014, Cornejo attempted to meet with Kevin a second time at his "buddy's house," but the second attempt also failed. On August 9, 2014, Cornejo arranged for another meeting at his "buddy's house" near Belmont Avenue and Drake Avenue. There was an alley behind the house running north and south.

¶ 30    On the morning of August 9, 2014, Kevin texted Cornejo asking whether Cornejo still wanted the Gamma 11's. Later in the day, Cornejo conversed with Kevin over text and arranged a meeting at 6 p.m. Cornejo gave Kevin directions to get to the alley behind his friend's house and told Kevin that he needed change for $100 because he only had three $100 bills. Kevin said he would get change. When the meeting time came, Kevin texted Cornejo that he had arrived in a black vehicle. Cornejo entered the alley from his friend's gangway and saw a black vehicle parked three houses down. The vehicle drove past Cornejo and stopped so that Cornejo was standing at the vehicle's rear. The vehicle's four windows were down, and Cornejo could see a female driver and male passenger.

¶ 31    When the vehicle stopped, Cornejo crossed the alley to the passenger's side, and Kevin exited the vehicle with a closed shoe box. Kevin placed the shoe box on the vehicle's trunk. Cornejo asked if he could look at the shoes and received permission to do so. Cornejo then opened the box and examined the shoes for "[s]cuffs" for about 10 seconds. Cornejo indicated that the shoes were acceptable, placed the shoes back in the box, and closed the box. Cornejo asked Kevin for change, and Kevin removed from his front right pocket two $20 bills and one $10 bill and gave them to Cornejo. Cornejo put this change in his back pocket, removed the three $100 bills from

his right pocket, and gave them to Kevin. Kevin gave Cornejo permission to take the shoes. Cornejo denied that there was "any further conversation of significance," and stated that the vehicle's driver never exited the vehicle or spoke with him. Cornejo also denied having a firearm at that time and denied that anything unusual happened during the purchase. The vehicle drove away, and Cornejo went back inside the gangway.

¶ 32    On August 14, 2014, at about 7 a.m., Cornejo was at his grandmother's house when his grandmother woke him up and told him that detectives were coming to speak with him. Cornejo got dressed, put on the Gamma 11's that he purchased from Kevin, and went outside. There, Cornejo saw detectives and police officers, and he was arrested.

¶ 33    On cross-examination, Cornejo stated that he liked "high-end gym shoes" and owned about seven or eight pairs. He had been a member of the Facebook group KREAM for about five months by the time he purchased the Gamma 11's from Kevin, and the Gamma 11's were his first purchase from KREAM. Cornejo denied that he ever communicated with someone named Jessie and stated that he directly dealt with "Armani Rodriguez." Cornejo confirmed that he did not keep the text messages exchanged during the first two attempts to meet with Kevin.

¶ 34    Cornejo also confirmed that he chose the alley behind his friend's house to meet up, but he could have met in a public setting, or at the house of a friend or family member. Cornejo confirmed that there was an abandoned building "a couple houses down" from his friend's house, but he denied that he exited from the gangway of the abandoned building. He stated that he exited from the house of his high school friend, Alex Alejandro.

¶ 35    On the day of the incident, Alejandro was at that house with Alejandro's parents and brothers. From 12 p.m. to 6:30 p.m., Cornejo played basketball with Alejandro in the house's backyard. He texted Kevin that he needed change at about 4:50 p.m. and went to a nearby gas

station to purchase water. Cornejo confirmed that he could have broken one of his $100 bills when he bought water. However, Cornejo had $302 at the time and spent the extra $2 on the water. At about 5 p.m. or 5:15 p.m., Cornejo returned to Alejandro's house from the gas station. He sat in the backyard with Alejandro and they talked "[f]or a couple of hours."

¶ 36    Cornejo stated that he asked Kevin over text whether Kevin would rob him because Cornejo "was scared [for his] life." When Cornejo entered the alley to make the exchange, Alejandro entered his house and went upstairs. Cornejo denied that he asked anyone in Alejandro's house to go with him to purchase the shoes despite being scared.

¶ 37    After further cross-examination, the following colloquy occurred:

"Q. So you thought it was a fair deal you said between you and Kevin, the $250, correct?

A. Yes.

Q. He didn't think it was a fair deal, did he?

A. He told me it was a fair deal.

Q. Well, they called the police, didn't they?

A. Correct.

Q. And you got arrested, right?

A. Yes.

Q. Do you have any idea why he would do that?

A. Well, because he called the cops.

Q. Why? Why do you think he called the cops?

A. Because he thinks I robbed him.

Q. Because you did?

A. I didn't rob him.

Q. So why do you think he called the police?

A. Because he thinks I robbed him.

Q. All right. And why did you think Samantha called the police?

[DEFENSE COUNSEL]: I'm going to object to speculation again.

THE COURT: Overruled.

\*\*\*

BY [ASSISTANT STATE'S ATTORNEY]:

Q. Why do you think Samantha called the police?

A. Because she thinks I robbed her.

Q. Right. Because you had a gun and you put it at their faces and you took the shoes and the $50?

A. I didn't have no gun."

¶ 38    Cornejo was also questioned in cross-examination regarding the story he gave at the police station, and his testimony contained a number of contradictions.

¶ 39    For instance, Cornejo confirmed that at the police station, Benavides told Cornejo that on August 9, 2014, "Kevin and Samantha Rodriguez were in an alley with [Cornejo] for [a] gym shoe transaction," and they had told the police Cornejo robbed them at gunpoint. Cornejo told Benavides he had no involvement in the robbery. However, later in his cross-examination, Cornejo claimed that the detective simply told him "[he] robbed someone" and did not identify the victim or details of the accusation. Rather, the detective asked Cornejo where "the stuff" was and asked

Cornejo, "[D]id you rob this person?" Cornejo claimed he did not even know why he was at the police station.

¶ 40    Cornejo also stated he could not recall telling Benavides that he did not know who Kevin or Samantha were, but he confirmed that he knew Kevin and Samantha at the time he was at the station. Additionally, Cornejo confirmed that he never told Benavides he was at the scene of the incident on August 9, 2014, and he never told Benavides that he paid Kevin $300 for the Gamma 11's. Later in his cross-examination, however, Cornejo stated that he told Benavides he bought the Gamma 11's from Kevin but "didn't go forward with *** details." Cornejo also stated that he told Benavides that he "bought a similar pair like [the Gamma 11's]" at a warehouse, and he denied telling the detective that he specifically bought Kevin's Gamma 11's at a warehouse in December.

¶ 41    Cornejo then testified that, on the same day as his arrest, in the presence of Benavides, an assistant state's attorney asked Cornejo "why [he] robbed this person." Cornejo responded that he did not rob him. According to Cornejo, the assistant state's attorney did not ask Cornejo what happened but rather "interrogate[d]" him. Cornejo also confirmed that he did not tell the assistant state's attorney that he bought the Gamma 11's from Kevin for $300 but rather told the assistant state's attorney he bought a "similar pair of shoes like that at the warehouse." Cornejo stated he was unable to tell the assistant state's attorney that he purchased Kevin's Gamma 11's because the assistant state's attorney and Benavides "didn't give [him] a chance to" and "just left [him] in the room."

¶ 42    On redirect examination, addressing the cross-examination testimony that Cornejo did not seek to get change at the gas station, Cornejo confirmed that "in [his] experience" gas stations do not accept bills above $20. He also confirmed that at the time of the incident, he made about $560 a week working at an airport, and it did not take him long to save up for the Gamma 11's. Further,

Cornejo stated that the money used to purchase the Gamma 11's was withdrawn from a bank, and he earned the money from his job. Then, the following colloquy occurred:

"Q. *** And you were asked do you think that Kevin and Samantha called 911—

A. Yes.

Q. —Just now on cross?

And if I recall your exact words were they thought I robbed them?

A. Right.

Q. *** Do you have any ability to know what they're thinking?

A. No.

Q. Did you rob them?

A. No."

¶ 43    Cornejo also testified he was wearing the Gamma 11's when he was arrested because he "bought them and *** wanted to wear [them]," and they were his favorite shoes. He denied trying to "hide anything" from the police.

¶ 44    As to his interactions at the police station, Cornejo testified that prior to speaking with Benavides, he did not know why he was at the station, and the Gamma 11's were taken from him. Cornejo again changed his testimony regarding what Benavides told him, stating Benavides did not give him any details of the incident other than the date, the victims, and the charged offense. Cornejo also clarified that he told Benavides he did not know who Kevin was because he thought Kevin's name was "Armani Rodriguez." He told Benavides his Gamma 11's were from the warehouse because he was "confused at the situation." Cornejo also testified that his ex-wife purchased a pair of shoes similar to the Gamma 11's from a warehouse and gave the pair to Cornejo as a gift.

¶ 45    On recross-examination, Cornejo stated that when Benavides and the assistant state's attorney asked where Cornejo got the Gamma 11's he was wearing, Cornejo answered that he bought them from Armani.

¶ 46    The defense rested.

¶ 47                          3. The State's Rebuttal Witnesses

¶ 48    Then, the State called Benavides again to testify in rebuttal. Benavides testified that on August 25, 2014, at 1:30 p.m., he Mirandized (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and interviewed Cornejo. Benavides told Cornejo "he was in custody for an armed robbery in which he lured two victims over to an address on Melrose through Facebook and then later through text messaging." Benavides told Cornejo that "once [the victims] were lured to that area they were then robbed." Benavides testified that he also informed Cornejo "that a pair of gym shoes were taken during the robbery and $50 of [United States currency] at gunpoint." Cornejo denied committing a robbery and stated he did not have any knowledge of the robbery or victims. Benavides then told Cornejo the location of the robbery and "how it occurred" but did not identify any names. Cornejo "denied any involvement in any robbery" and said that he had purchased the shoes he wore during his arrest from a warehouse in December 2013. According to Benavides, Cornejo never stated that he bought a similar pair of shoes from a warehouse. Cornejo also never stated that he bought the shoes he was wearing from an individual he met through Facebook, and he never stated that he purchased the shoes from a person named Armani.

¶ 49    On cross-examination, Benavides confirmed that Cornejo told the assistant state's attorney that his ex-wife bought him a pair of gym shoes at a warehouse. Benavides also stated, "I believe [Cornejo] told me something similar to that." However, on redirection examination, the State presented Benavides with a "closing case report." Based on the report, Benavides stated, "The

defendant told me that *** he has bought many pair[s] of gym shoes in the past, but then only told me that there was an empty box belonging to the gym shoes he was wearing the day he got arrested at his spouse's garage."

¶ 50    Assistant State's attorney Mark Griffin testified that on August 25, 2014, at about 4:30 p.m., he went to the police station where Cornejo was held, spoke with Benavides, and reviewed the arrest report and case report. Griffin also spoke with Kevin and Samantha. At about 6:10 p.m., he, Benavides, and Detective Oswald[2] Mirandized and interviewed Cornejo. Griffin "explained the general nature of the robbery," stated that it happened two weeks ago, and told Cornejo he was accused "of robbing someone [at] gunpoint and taking their shoes." Griffin asked Cornejo about the shoes he had worn when he was arrested, and Cornejo explained that "he bought them *** [in] December of 2013 from a warehouse in the city on Addison and Kedzie." Cornejo did not tell Griffin that he purchased the shoes from Kevin or "Armani Rodriguez."

¶ 51                              4. Closing Arguments

¶ 52    During closing arguments, the State recounted the facts of the case as told by Kevin and Samantha. Then, the State argued:

"So how do we know that this is what happened? You know because Samantha and Kevin told you so. But they didn't just tell you one time. They didn't just tell their story from the stand. They told that same account of this incident, this robbery five separate times, including the time that they were here on the stand.

They told their account of this incident, this robbery to the 911 caller. They told their account to the first officers that arrived. They told their account to the second officers

_____

[2]The first name of Detective Oswald does not appear in the transcript of the trial proceedings.

that arrived. They told their account to the detective when they met with him as well. And then they came in here and told you.

And how do we know they're telling the truth, because all of the evidence in this case corroborates exactly what they told you."

The defense did not object to this portion of the State's argument.

¶ 53 The defense in closing questioned why Cornejo used his personal Facebook account to arrange the shoe purchase if he intended to steal the shoes. Further, the defense argued that Cornejo had told the truth on the witness stand and that he had been "understandabl[y]" confused by some of the questions. The defense suggested that Kevin and Samantha had lied about the robbery because they did not want their father to know they had sold the Gamma 11's, since the Gamma 11's were a gift to Kevin from their father. Additionally, the defense questioned how Samantha knew so many details of the transaction to sell the Gamma 11's when the transaction was arranged between Kevin and Cornejo.

¶ 54                               5. The Jury's Instructions and Verdict

¶ 55 During trial, the parties disputed the jury instructions to be given. The defense asked that the jury not be provided with the lesser-included offense of aggravated robbery and reasoned that there was no probative evidence that a robbery occurred without a firearm. The State, however, asserted that the lesser-included offense should be given because the firearm in question was not recovered. Because Kevin and Samantha had little knowledge of firearms, the State argued it could be determined from their testimony that the object Cornejo pointed at them was not a real firearm. The circuit court determined that the jury would be instructed as to the lesser-included offense, over the defense's objection.

¶ 56    The record reflects that, after closing arguments, the jury was presented with the following verdict forms: (1) one form stating Cornejo was found "guilty of aggravated robbery," which was provided to the jury over the defense's objection; (2) one form stating Cornejo was found "guilty of armed robbery," which received no objections; and (3) one form stating Cornejo was found "not guilty of armed robbery and not guilty of aggravated robbery," which was provided to the jury over the defense's objection.

¶ 57    The jury found Cornejo "guilty of aggravated robbery."

¶ 58                    C. Posttrial Motions

¶ 59    Cornejo filed a motion for new trial, alleging that the lesser-included offense of aggravated robbery was improperly included in the jury instructions and verdict forms, when the evidence did not support a finding of aggravated robbery. Cornejo reasoned that the evidence did not show "that a robbery occurred which did not involve a firearm nor that the robbery could have occurred without the possession of a firearm." Additionally, Cornejo alleged that Kevin and Samantha lacked credibility.

¶ 60    Subsequently, Cornejo filed an amended motion for new trial, alleging that the evidence at trial was insufficient to support a conviction for aggravated robbery and that the court improperly allowed the inclusion of the lesser-included offense of aggravated robbery in the jury instructions and verdict forms. The amended motion additionally reiterated that Kevin and Samantha lacked credibility.

¶ 61    At the hearing on the motion, the State responded that the evidence showed that Cornejo had committed the robbery "while indicating verbally or by his actions to the victim that he was at that time armed with a firearm." The State argued that the jury did not have to find that Cornejo

had an actual firearm when he did so. As the State noted, the testimony of Kevin and Samantha showed that they "had a lack of familiarity with weapons."

¶ 62    The circuit court denied Cornejo's motion. The court observed that Kevin and Samantha were "unsophisticated in *** their knowledge of weapons" and that their testimony suggested they may not have been able to determine whether the item Cornejo was holding was a firearm. The court also noted that a firearm was never actually recovered in the case and that Cornejo never touched Kevin or Samantha with the firearm or demonstrated that the firearm worked. Accordingly, the court concluded that the evidence supported a finding of the lesser-included offense of aggravated robbery, and this offense was properly included in the jury instructions and verdict forms.

¶ 63                              D. Sentencing Hearing

¶ 64    At the sentencing hearing, the circuit court had access to the presentence investigation report (PSI), which stated Cornejo had no previous criminal convictions. As to his childhood, Cornejo stated that he "was raised by both parents in a good stable household," that his parents and siblings are "healthy and are doing well," and that he "is close to all of his family members and that he keeps in touch with them as often as possible." Cornejo attended high school up until his junior year but quit because "he had lost interest."

¶ 65    Also according to the PSI, in 2014, Cornejo married, had one child from his marriage, and divorced in late 2015. Cornejo was required to pay $100 in monthly child support to the child from his marriage. Cornejo later had two more children with his girlfriend, with whom he was still in a relationship at the time of the PSI's entry. From February 2016 through July 2016, Cornejo worked in maintenance. Then, from August 2016 through early December 2017, Cornejo worked as a

construction laborer. Cornejo reported that, prior to incarceration, he earned about $1400 a month from employment and his monthly expenses averaged about $1400.

¶ 66    The PSI additionally stated that Cornejo has never "been a gang member" and has never been "involved in any gang related criminal activity." He stated that he "has many friends and acquaintances that have a positive influence on him." Cornejo also reported being in "good" physical and psychological condition and reported that he has never had a problem with alcohol or illicit drug usage. Further, Cornejo stated he "has a positive outlook for his future" and "plans to continue his education in the near future."

¶ 67    In aggravation, the State called Chicago Police Department Officer Silius,[3] who testified that on August 10, 2014, shortly before 9:30 p.m., he responded to a report of "gang disturbance" around the 2100 block of North Campbell Avenue. Silius learned that multiple men were standing on the sidewalk "yelling gang slogans" at passing vehicles. Silius and his partner arrived in plain clothes and saw Cornejo and four other men yelling at passing vehicles. The officers approached the men for a "field interview," and two of the men ran while Cornejo and two other men stayed. Cornejo was arrested and charged with "reckless conduct." At that time, Cornejo did not have any tattoos on his hands. Silius testified that he was familiar with a gang called the Harrison Gents, and that the Harrison Gents' gang colors are black and purple.

¶ 68    Chicago police officer Sean Markham testified that on August 25, 2014, at about 7:05 a.m., he arrested Cornejo on the 2700 block of North Ridgeway Avenue. Cornejo was wearing Nike Air Jordan gym shoes that were "[b]lack and blueish purplish color with yellow lettering on it." Cornejo also had the letters "H" and "G" tattooed on his hands.

---

[3]The first name of Silius does not appear in the transcript of the proceedings.

¶ 69    In mitigation, the defense called Yesenia Rodriguez (Yesenia), who testified that she was the mother of Cornejo's two daughters. Yesenia stated that before "all of this happened," Cornejo was supporting her and helping her provide for her children. She also testified that she would be unable to care for her children if Cornejo was in custody.

¶ 70    On cross-examination, Yesenia stated that Cornejo does not give her child support, but he did still give his ex-wife child support money. Yesenia confirmed that Cornejo nonetheless helps provide for her children. Yesenia stated that, in August 2014, she lived with Cornejo at Cornejo's mother's house. Under examination from the court, Yesenia stated that Cornejo did not charge her rent and that Cornejo paid for her meals. After Cornejo's arrest, she began living at her mother's house with her two daughters, mother, and two brothers.

¶ 71    The parties then presented argument.

¶ 72    The State asserted they were seeking a "substantial penitentiary sentence," arguing that Cornejo was a member of the Harrison Gents. The State referred to text messages that had not been presented at trial in which Kevin asked Cornejo if he was involved in a gang. Cornejo responded, "Yeah, am a Harrison Gents. Don't try pulling some s***. Feel me."[4] The State called Cornejo a "Harrison Gents wannabe" and stated that "now we have some context as to why he did

_____

[4]The record reflects that, prior to trial, the parties had agreed the portion of the text conversation between Cornejo and Kevin regarding Cornejo's potential gang affiliation would not be presented to the jury at trial. The parties agreed the offense was not "gang motivated"—therefore, evidence regarding Cornejo's apparent gang affiliation would not have been probative as to the issues presented at trial. Nonetheless, "[d]uring the sentencing phase of trial, the trial judge is not limited to evidence that would be admissible only during trial." *People v. Tipton*, 207 Ill. App. 3d 688, 705 (1990). Thus, the circuit court was not necessarily precluded from considering the text messages simply because they were not presented at trial. We also note that it would have been best practices for the State to present these text messages once again at the sentencing hearing, if the State intended to raise them in its argument in aggravation. Nonetheless, Cornejo has not raised any dispute with the propriety of this portion of the State's argument, and so he has forfeited any issue regarding the argument. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (stating that points not argued in the opening brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

this." According to the State, the Gamma 11's that Cornejo stole had the Harrison Gents gang colors, and Cornejo subsequently got the gang's letters tattooed on his hands. The State also emphasized that in the PSI, Cornejo had lied about not being involved in a gang. Thus, the State argued "we have a situation where the defendant still is not being truthful."

¶ 73    The defense emphasized that Cornejo was only 20 years old at the time of the offense, that Cornejo provides for three children, and that he is legally responsible to pay for one of them. The defense also asserted that Cornejo was "steadily working in construction as a baggage handler at O'Hare," that Cornejo had no prior convictions, and that the prior reckless conduct charge the State raised in aggravation "was dismissed." Additionally, the defense raised that Cornejo was "tied to the community" and was close to his family. As to the claimed gang affiliation, the defense argued that there was no evidence that the shoe robbery was tied to gang-related activity. The defense requested probation with "proper monitoring" and argued that prison was not going to rehabilitate Cornejo. The defense argued that no one "want[s] to see [Cornejo] back in the revolving door of the system."

¶ 74    The circuit court stated that it had listened to the evidence in aggravation and in mitigation and considered the facts of the case. The court "disagree[d]" with the defense that Cornejo's life "can go one way or another." Rather, the court stated, "He's picked what side he wants. He stamped what side he wants on his hands." The court found the case "disturbing," as Cornejo "lure[d] two teenagers to an alley" and asked them to bring change to ensure they had "more money available for him to steal." The court stated, "This has got to stop. I don't find him to be an appropriate candidate for probation."

¶ 75    The circuit court sentenced Cornejo to seven years' imprisonment. The court denied Cornejo's motion to reconsider the sentence, which argued that Cornejo's seven-year sentence was excessive and that probation was more appropriate.

¶ 76    This appeal followed.

¶ 77                                    II. ANALYSIS

¶ 78                        A. Lesser-Included Offense Conviction

¶ 79    On appeal, Cornejo first argues that his lesser-included aggravated-robbery conviction violated due process (1) because the offense of aggravated robbery cannot be inferred from Cornejo's charging instrument and so Cornejo was convicted of an uncharged offense and (2) because the evidence at trial was not sufficient to establish guilt as to aggravated robbery but not armed robbery.

¶ 80    "A defendant in a criminal prosecution has a fundamental due process right to notice of the charges against him; thus, a defendant may not be convicted of an offense he has not been charged with committing." *People v. Clark*, 2016 IL 118845, ¶ 30. Nonetheless, a defendant may be convicted of an uncharged offense that is "a lesser-included offense of a crime expressly charged in the charging instrument [citation], and the evidence adduced at trial rationally supports a conviction on the lesser-included offense and an acquittal on the greater offense [citation]." *People v. Kolton*, 219 Ill. 2d 353, 360 (2006).

¶ 81    Illinois courts apply the charging instrument approach when determining whether an uncharged offense is the lesser-included offense of a charged crime. *People v. Kennebrew*, 2013 IL 113998, ¶ 32. Under this approach, a reviewing court engages in two steps: (1) "the court determines whether the offense is a lesser-included offense" and (2) "the court examines the evidence at trial to determine whether the evidence was sufficient to uphold a conviction on the

lesser offense." *Id.* ¶ 30. We review *de novo* whether a charged offense encompasses an included offense. *People v. Landwer*, 166 Ill. 2d 475, 486 (1995).

¶ 82　Here, Cornejo was charged with armed robbery but ultimately convicted of aggravated robbery. Section 18-1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/18-1(a) (West 2014)) provides that "[a] person commits robbery when he or she knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force." "A person commits armed robbery when he or she violates Section 18-1; and *** carries on or about his or her person or is otherwise armed with a firearm *** ." *Id.* § 18-2(a)(2). As to aggravated robbery, section 18-1(b)(1) of the Code (*id.* § 18-1(b)(1)) states as follows:

> "A person commits aggravated robbery when he or she violates subsection (a) while indicating verbally or by his or her actions to the victim that he or she is presently armed with a firearm or other dangerous weapon ***. This offense shall be applicable even though it is later determined that he or she had no firearm or other dangerous weapon *** in his or her possession when he or she committed the robbery."

Therefore, as section 18-1(b)(1) expressly states, it is not necessary that the accused actually have a firearm to receive a conviction for aggravated robbery, so long as the accused indicates that he or she is armed.

¶ 83　Cornejo's armed robbery charge alleged that Cornejo:

> "knowingly took property, to wit: shoes and United States currency, from the person or presence of Kevin Rodriguez, by the use of force or by threatening the imminent use of force and Jaime Cornejo carried on or about his person or was otherwise armed with a firearm."

The question before this court is whether this language supports a reasonable inference that Cornejo committed robbery "while indicating verbally or by his or her actions to the victim that he or she is presently armed with a firearm or other dangerous weapon." *Id.*

¶ 84    Initially, we find it necessary to outline the precedent set forth in *People v. Novak*, 163 Ill. 2d 93, 112 (1994), and *Kolton*, 219 Ill. 2d 353, as the parties dispute the role that *Kolton* played in developing our application of the charging instrument approach.

¶ 85    Namely, Cornejo states that we must follow the precedent set forth in *People v. Jones*, 293 Ill. App. 3d 119 (1997), *People v. McDonald*, 321 Ill. App. 3d 470 (2001), and *People v. Kelley*, 328 Ill. App. 3d 227 (2002). These cases predated *Kolton* and heavily relied on *Novak* in finding that a charge of armed robbery could not support a conviction of aggravated robbery.

¶ 86    The State, on the other hand, asserts that we must follow *People v. Johnson*, 2015 IL App (1st) 141216, which found that a charge of armed robbery nearly identical to Cornejo's armed robbery charge *could* support a conviction of aggravated robbery. The State asserts that the ruling in *Johnson* was entered after *Kolton* and reflects a more accurate use of the charging instrument approach as set forth in *Kolton*. Cornejo, however, claims that the *Johnson* court wrongly interpreted *Kolton* to be establishing a new rule of law that implicitly overturned *Jones*, *Kelley*, and *McDonald*.

¶ 87    We find the State's interpretation of the law regarding this issue to be more accurate.

¶ 88    In *Novak*, the Illinois Supreme Court applied the charging instrument approach and found that a charging instrument alleging aggravated criminal sexual assault could not support a conviction of aggravated criminal sexual abuse. *Novak*, 163 Ill. 2d at 113-14. The court reasoned that the charging instrument only alleged that the defendant committed the act of sexual penetration in making contact with the victim's mouth using the defendant's penis. *Id.* at 114.

However, the charge contained no allegations that any touching or fondling was done "for the purpose of sexual gratification or arousal," which was ultimately required to establish aggravated criminal sexual abuse. *Id.* Three dissenting judges took the position that the majority had applied the charging instrument approach too narrowly and that a court could have reasonably inferred that the defendant "was motivated by a desire for sexual gratification." *Id.* at 121-25 (Nickels, J., dissenting).

¶ 89    Following *Novak*, this court in *Jones*, *McDonald*, and *Kelley* found that a charging instrument alleging armed robbery could not support a conviction for aggravated robbery. *Kelley*, 328 Ill. App. 3d at 232; *McDonald*, 321 Ill. App. 3d at 474; *Jones*, 293 Ill. App. 3d at 129. These determinations heavily relied on *Novak* and found that an element of aggravated robbery that was missing from the express language of an armed robbery charge could not be inferred from the armed robbery charge. *Kelley*, 328 Ill. App. 3d at 230-32; *McDonald*, 321 Ill. App. 3d at 472-74; *Jones*, 293 Ill. App. 3d at 128-29.

¶ 90    In *Kolton*, however, the supreme court overturned its prior ruling in *Novak*, stating that "the manner in which the majority applied the charging instrument approach in that case has since been eroded and the majority decision can no longer be sustained." *Kolton*, 219 Ill. 2d at 364. The court more specifically stated that the *Novak* court, in applying the charging instrument approach, failed to consider whether it could be inferred that the defendant acted "for the purpose of sexual gratification or arousal" when performing the offense. *Id.* The *Kolton* court found that "[a] review of this court's decisions since *Novak* reveals that the absence of a statutory element will not prevent us from finding that a charging instrument's description contains a broad foundation or main outline of the lesser offense." (Internal quotation marks omitted.) *Id.* The court held "[i]t is now well settled that, under the charging instrument approach, an offense may be deemed a lesser-

included offense even though every element of the lesser offense is not explicitly contained in the indictment, as long as the missing element can be reasonably inferred." *Id.*

¶ 91    The *Kolton* court expressly rejected the *Novak* court's narrow application of the charging instrument approach in favor of a more lenient application that allowed courts to infer missing elements from the language of a charging instrument. In doing so, the supreme court also implicitly rejected the analysis set forth in *Jones*, *McDonald*, and *Kelley*.

¶ 92    We therefore find *Johnson*, 2015 IL App (1st) 141216, instructive, as it properly applies the charging instrument approach as it was applied in *Kolton*. In *Johnson*, the defendant was charged with armed robbery using a firearm, and the charging instrument stated that defendant:

> " 'knowingly took property, to wit: United States currency, from the person or presence of [the victim] ***, by the use of force or by threatening the imminent use of force and [defendant] carried on or about his person or was otherwise armed with a firearm.' " *Id.* ¶¶ 5-6.

At the bench trial, the victim testified that the defendant had "showed and pointed a firearm" at the victim, but no firearm was recovered or produced at trial. *Id.* ¶ 7. The trial court, however, found that the State had not proved that defendant was armed with a firearm and stated that it " '[could] not conclude beyond a reasonable doubt that the implement that was used to frighten the victim in this matter was in fact a firearm.' " *Id.* ¶ 8. Therefore, the trial court in *Johnson* found the defendant guilty of aggravated robbery. *Id.*

¶ 93    On appeal before this court, the defendant in *Johnson* argued that the trial court violated his right to due process by convicting him of aggravated robbery because it was not a lesser-included offense of his charge of armed robbery. *Id.* ¶ 12. This court cited *Kolton* and found that, based on the defendant's information, "it was reasonably inferable that defendant was presently

armed with a firearm, and indicated to the victim either verbally or by his actions that he was presently armed with a firearm." *Id.* ¶ 36. Therefore, we concluded that the information's description of armed robbery included the lesser offense of aggravated robbery. *Id.*

¶ 94    Nonetheless, we found that the evidence at trial did not support a conviction of aggravated robbery because there was no evidence that the defendant indicated that he was armed with a firearm. *Id.* ¶¶ 39, 44. Because the circuit court did not find the victim's testimony credible that the defendant frightened the victim with a firearm, and because there was no other evidence that the defendant indicated he had a firearm, we found the circuit court could not have found the defendant guilty of aggravated robbery. *Id.* ¶ 44.

¶ 95    Here, Cornejo's indictment was nearly identical to the information of the defendant in *Johnson*. As the court in *Johnson* found, we also find that this charge contained language allowing a reasonable inference that Cornejo indicated to Kevin, either by words or by action, that he was presently armed with a firearm. *Id.* ¶ 36. Namely, the allegation that Cornejo threatened the imminent use of force against Kevin while being armed with a firearm supports a reasonable inference that Cornejo specifically used said firearm to threaten Kevin.

¶ 96    We conclude that Cornejo's charge of armed robbery sufficiently stated facts to include the lesser offense of aggravated robbery. Accordingly, the charging instrument satisfies the first prong of the charging instrument approach.

¶ 97    We next consider the second prong of the charging instrument approach: whether the evidence at trial supported a conviction of aggravated robbery but acquittal of armed robbery. *Kennebrew*, 2013 IL 113998, ¶ 30. Looking to the reasoning of *Johnson*, we find that it did.

¶ 98    As we have noted, the defendant in *Johnson* could not have been convicted of aggravated robbery, if found not guilty of armed robbery, because the court had rejected the sole evidence

showing that the defendant threatened the victim with a firearm. *Johnson*, 2015 IL App (1st) 141216, ¶ 44. Because the circuit court rejected this limited evidence, there was simply no remaining evidence showing that the defendant indicated he had a firearm. *Id.*

¶ 99    Here, both Kevin and Samantha consistently testified that, after taking Kevin's shoes, Cornejo pointed a firearm at them and stated, "Drive or I'll shoot." Based on this evidence, the jury could have concluded both (1) that Cornejo verbally threatened to shoot Kevin and Samantha, and (2) that the object Cornejo pointed at Kevin and Samantha was not actually a firearm. This conclusion would be further bolstered by the testimony of Kevin and Samantha regarding their limited knowledge of firearms.

¶ 100   As we have previously stated, an accused may be found guilty of aggravated robbery by committing robbery while indicating that he or she has a firearm, regardless of whether the accused actually has a firearm. 720 ILCS 5/18-1(b)(1) (West 2014). The offense of armed robbery, however, requires that the accused be armed with a weapon. *Id.* § 18-2(a)(2). The evidence at trial supported a finding of guilt as to aggravated robbery, and the jury did not need to find that Cornejo actually carried a firearm during the robbery when he verbally threatened to shoot Kevin and Samantha. Therefore, the jury properly found Cornejo guilty of aggravated robbery, despite finding him not guilty of armed robbery.

¶ 101   We affirm the judgment of the circuit court as to this issue.

¶ 102                   B. Improper Cross-Examination of Cornejo

¶ 103   Cornejo also argues that the State engaged in prosecutorial misconduct by (1) improperly embarrassing Cornejo before the jury by asking him to speculate as to why Kevin and Samantha reported a robbery to the police and (2) improperly bolstering the credibility of Kevin and

Samantha by arguing in closing argument that Kevin and Samantha were credible because they testified consistently.

¶ 104   The parties do not dispute that Cornejo failed to preserve this issue for appeal. While Cornejo's trial counsel objected at trial to the cross-examination in question, he did not raise the issue in a posttrial motion. Moreover, Cornejo's trial counsel never objected to the portion of closing argument that Cornejo now challenges, and his counsel never raised the closing argument challenge in a posttrial motion. See *People v. Reese*, 2017 IL 120011, ¶ 60 ("To preserve an issue for review, a defendant must object at trial and raise the alleged error in a written posttrial motion."). As such, Cornejo asserts that we should consider his claim of prosecutorial misconduct under the plain error doctrine.

¶ 105   The plain error doctrine "allows a reviewing court to reach a forfeited error affecting substantial rights" under certain circumstances. *People v. Herron*, 215 Ill. 2d 167, 178 (2005). Namely, the plain error doctrine applies when either:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Clark*, 2016 IL 118845, ¶ 42.

¶ 106   Cornejo argues that the first prong of the plain error doctrine should apply here. However, before reaching the first prong of the plain error doctrine, we must first determine "whether the claim presented on review actually amounts to a clear or obvious error at all." (Internal quotation

marks omitted.) *People v. Staake*, 2017 IL 121755, ¶ 33. In determining whether an error occurred, we address each of Cornejo's prosecutorial misconduct claims separately.

¶ 107                    1. Cross-Examination of Cornejo Calling for Speculation

¶ 108   We first address Cornejo's claim that the State improperly cross-examined him regarding why Kevin and Samantha called the police on him.

¶ 109   Illinois Rule of Evidence 602 (eff. Jan. 1, 2011) provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Further, "it is generally improper to ask a witness on cross-examination whether an adverse witness' testimony is truthful." *People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989). "[S]uch questions invade the province of the jury by infringing upon its function to determine the credibility of witnesses." *People v. Evans*, 373 Ill. App. 3d 948, 961 (2007). "Nevertheless, the latitude permitted on cross-examination is left largely to the discretion of the trial judge and he will not be reversed absent an abuse of discretion which results in manifest prejudice to the defendant." *People v. Enis*, 139 Ill. 2d 264, 295 (1990).

¶ 110   At trial, the State presented testimony from both Kevin and Samantha that after arranging the shoe purchase with Cornejo online, they met with Cornejo in an alley, and Cornejo stole the Gamma 11's and $50 at gunpoint. However, Cornejo testified on direct examination that the purchase went smoothly and that he simply received the Gamma 11's from Kevin in exchange for the agreed-upon $250. On cross-examination, Cornejo testified that Kevin told Cornejo they had a "fair deal." The State then repeatedly asked why Cornejo thought that Kevin and Samantha called the police, to which Cornejo responded that they thought he robbed them. Cornejo's trial counsel objected to this line of questioning as speculation, but the trial court overruled the objection.

¶ 111   We find that the State asked Cornejo to speculate as to matters that were clearly outside Cornejo's personal knowledge, and therefore the questioning was improper under Illinois Rule of Evidence 602. Namely, the State asked Cornejo to testify as to the subjective motives of Kevin and Samantha in order to explain their actions.

¶ 112   The parties discuss the applicability of *Enis* and *Kokoraleis*, in which the supreme court permitted the cross-examination of a defendant as to the truthfulness of certain State witnesses. *Id.* at 295; *Kokoraleis*, 132 Ill. 2d at 264-65. These cases are distinguishable, however.

¶ 113   In *Enis*, the supreme court found it was proper for the prosecutor to ask the defendant if he had any knowledge as to why the victim reported the defendant's offense to the police and a friend. *Enis*, 139 Ill. 2d at 295. The *Enis* court even noted that once the defendant stated these facts were not within his personal knowledge, "it was improper to continue to question about the numerous specifics that the prosecutor asked." *Id.* Similarly, in *Kokoraleis*, the supreme court found it was proper for the prosecutor to ask the defendant "whether certain State witnesses were lying when they testified in a manner contrary to the defendant's version of events." *Kokoraleis*, 132 Ill. 2d at 264.

¶ 114   In both *Enis* and *Kokoraleis*, the defendant was questioned regarding matters of which he would have had personal knowledge. Questions as to whether a defendant knows why a victim would report an offense, or questions as to whether or not a witness is lying, only seek to elicit a "yes" or "no" answer and do not necessarily require the defendant to testify broadly and speculatively. That was not the case here.

¶ 115   The State did not ask Cornejo whether he had knowledge as to why Kevin and Samantha called the police and reported him for robbery. Rather, the State asked Cornejo to broadly explain why Kevin and Samantha called the police. Because this questioning called for Cornejo to

speculate as to matters outside his personal knowledge, allowing this questioning constituted a clear and obvious error.

¶ 116   Having found an error occurred, we now turn to whether the evidence at trial was closely balanced for purposes of the first prong of the plain error doctrine. *Clark*, 2016 IL 118845, ¶ 42. We find that it was not.

¶ 117   At trial, Kevin and Samantha consistently testified that Cornejo had arranged to meet up with them in an alley to purchase the Gamma 11's for $250. However, Cornejo took the shoes and $50 in change, pointed a firearm at Kevin and Samantha, and told them to drive away or he would shoot them.

¶ 118   Cornejo testified on his own behalf and claimed that he had given Kevin $300 in exchange for the Gamma 11's and $50 in change. However, when pressed by the State, Cornejo was unable to explain why he chose to buy the shoes in an alley as opposed to his house or the friend's house he was staying at. In fact, Cornejo acknowledged that he could have arranged the meet up at a more public location.

¶ 119   Further, Cornejo was thoroughly impeached, as the testimony elicited by the State showed Cornejo changing his story multiple times, even on the stand. In cross-examination, Cornejo both admitted and denied at different points that he previously told Benavides he had purchased the Gamma 11's from Kevin. He provided mixed testimony regarding the questions he was asked at the police station. He also provided mixed testimony as to whether he reported that he had bought the Gamma 11's at a warehouse, bought a similar pair of shoes at a warehouse, or received a similar pair of shoes purchased at a warehouse by his ex-wife.

¶ 120    The State's rebuttal witnesses stated that during the interview at the police station, Cornejo stated he had bought the Gamma 11's from a warehouse in December 2013. Cornejo never told Benavides he bought the shoes from a person he met through Facebook.

¶ 121    Given the credibility and close corroboration of the State's witnesses, and given the Cornejo's severe impeachment by the State, we cannot conclude that the evidence at trial was closely balanced. See *People v. White*, 52 Ill. App. 3d 517, 521 (1977) (finding the evidence at trial was not closely balanced, where the defendant was "severely impeached both on cross-examination and in rebuttal"); see also *People v. Young*, 2013 IL App (2d) 120167, ¶ 31 (finding the evidence at trial was not closely balanced where the defendant's evidence was "merely *** self-serving testimony"). Therefore, we find Cornejo cannot benefit from the plain error doctrine and has forfeited his claim that the State improperly cross-examined him.

¶ 122                     2. Improper Remarks in Closing Argument

¶ 123    We next address Cornejo's claim that the State in closing argument improperly referred to prior consistent statements made by Kevin and Samantha as evidence of Kevin and Samantha's credibility.

¶ 124    "[I]t is well established that a prosecutor is allowed wide latitude in closing argument [citation] and it is entirely proper for the prosecutor, during closing argument, to comment on the evidence offered at trial and to draw legitimate inferences from the evidence, even if those inferences are detrimental to the defendant." *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006). "While a prosecutor may not make arguments or assumptions that have no basis in evidence, improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused." *People v. Sutton*, 353 Ill. App. 3d 487, 498 (2004). "In reviewing allegations of prosecutorial misconduct, the closing arguments of

both the State and the defendant must be examined in their entirety, and the complained-of remarks must be placed in their proper context." (Internal quotation marks omitted.) *People v. Caffey*, 205 Ill. 2d 52, 104 (2001).

¶ 125   Cornejo observes that there is currently a split in the appellate court regarding which standard of review should apply to issues regarding prosecutorial misconduct in closing argument. This split stems from two statements made by the Illinois Supreme Court in *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), which suggested that the *de novo* standard applies, and *People v. Blue*, 189 Ill. 2d 99, 128 (2000), which suggested that the abuse of discretion standard applies.

¶ 126   In *Phagan*, this district found that the abuse of discretion standard is the proper standard, as "the trial judge is present for the entire trial, *** has the benefit of 'hearing the remarks of counsel on both sides' and is better situated to determine whether anything that happened or was said justifies the challenged remark." *People v. Phagan*, 2019 IL App (1st) 153031, ¶¶ 48-50 (quoting *North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486, 502 (1892)). In making this determination, we noted that "the pedigree for an abuse of discretion standard spans more than a hundred years." *Id.* ¶ 49 (citing *People v. McCann*, 247 Ill. 130, 170-71 (1910), and *Bulliner v. People*, 95 Ill. 394, 405-06 (1880)).

¶ 127   Application of the *de novo* standard, however, "does not enjoy similar historical support," as the court in *Wheeler* based its application of the *de novo* standard on *People v. Graham*, 206 Ill. 2d 465 (2003). *Phagan*, 2019 IL App (1st) 153031, ¶ 51. As we observed, the *Graham* court referenced two different issues raised by the defendant, one of which was the defendant's challenge to the prosecutor's remarks in closing argument, and stated, " 'We review this legal issue *de novo*,' " without distinguishing the two claims. *Id.* (quoting *Graham*, 206 Ill. 2d at 474). Moreover, the *Graham* court considered the prosecutorial misconduct issue under the framework

of an ineffective assistance claim (*id.* ¶ 52 (citing *Graham*, 206 Ill. 2d at 476-77)), and ineffective assistance claims are reviewed *de novo* (*id.* (citing *People v. Demus*, 2016 IL App (1st) 140420, ¶ 27)). Therefore, it was unclear whether *Graham* was applying *de novo* standard as to the prosecutorial misconduct claim or the ineffective assistance claim. *Id.*

¶ 128   We agree with our reasoning in *Phagan* and conclude that Cornejo's prosecutorial misconduct claims are more appropriately reviewed under the abuse of discretion standard. *Id.* ¶¶ 48-50. Under this standard, "[t]he regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *Blue*, 189 Ill. 2d at 128.

¶ 129   Cornejo claims the State improperly argued that the Kevin and Samantha were credible witnesses simply because they had repeated their story multiple times. In making this argument, however, Cornejo only relies on Illinois Rule of Evidence 613(c) (eff. Jan. 1, 2011), which concerns the admissibility of prior consistent statements of a witness, and two cases that concerned the admissibility of a witness's prior consistent statements made prior to trial: *People v. Hudson*, 86 Ill. App. 3d 335 (1980), and *People v. Smith*, 139 Ill. App. 3d 21 (1985). *Hudson* and *Smith* both stand for the principle that a witness's statements prior to trial cannot be used to bolster the witness's testimony at trial. *Hudson*, 86 Ill. App. 3d at 339 ("It is the general rule that a witness may not testify as to statements he made out of court for the purpose of corroborating his testimony given at trial."); *Smith*, 139 Ill. App. 3d at 32 ("Evidence of a statement made by a witness out of court but harmonizing with his testimony is inadmissible except where he is charged with recent fabrication or his opponent raises an inference that he has a motive to testify falsely."). Cornejo

cites no authority under which a prosecutor's reference to a witness's prior consistent statement could constitute a reversible error.

¶ 130   Nonetheless, viewing the prosecutor's challenged remarks in the context of the entire closing argument, it is clear that the prosecutor's remarks were not intended to encourage the jury to improperly consider the prior consistent statements of Kevin and Samantha.

¶ 131   The prosecutor told the jury that Kevin and Samantha were credible because their stories corroborated one another. Then, the prosecutor continued to list the multiple times that Kevin and Samantha had given their account prior to trial, and stated: "And how do we know they're telling the truth, because all of the evidence in this case corroborates exactly what they told you." It is clear from the record that the prosecutor was simply drawing attention to the close corroboration of the State's evidence. The State did not actually describe the substance of any prior statements given by Kevin and Samantha but merely stated in passing that Kevin and Samantha had previously given their statements. See *People v. Sangster*, 2014 IL App (1st) 113457, ¶¶ 124-26 (finding a prosecutor's reference in closing argument to witnesses' prior consistent statements did not constitute error, where the prosecutor did not discuss the "substance" of the prior statements, and the prior statements provided necessary context).

¶ 132   Even if the prosecutor's remarks constituted error, however, we reiterate our finding that the evidence at trial was not closely balanced. As such, even if we were to conclude that an error occurred, we would necessarily conclude that Cornejo forfeited this issue and cannot seek its resolution under the plain error doctrine.

¶ 133   We therefore reject Cornejo's argument that the State improperly bolstered its witnesses' credibility by referencing any prior consistent statements.

¶ 134                                  C. Excessive Sentencing

¶ 135   We last address Cornejo's claim that the trial court imposed an excessive sentence on him, in light of the high mitigating factors and lack of aggravating factors.

¶ 136   The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. In balancing the retributive and rehabilitative purposes of punishment, the circuit court must consider "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." (Internal quotation marks omitted.) *People v. Velez*, 388 Ill. App. 3d 493, 515 (2009). The circuit court has "broad discretionary powers" in determining an appropriate sentence, and we must afford "great deference" to the circuit court's sentencing decision because "the trial court is generally in a better position than the reviewing court to determine the appropriate sentence." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

¶ 137   While Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) grants reviewing courts the authority to reduce a defendant's sentence, this power "should be exercised cautiously and sparingly." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A reviewing court may not "substitute its judgment for that of the trial court merely because it would have weighed these factors differently." (Internal quotation marks omitted.) *Id.* at 213. Further, we must presume that the trial court evaluated any relevant factors in mitigation before it, and this presumption "cannot be overcome without affirmative evidence of the sentencing court's failure to do so." *People v. Busse*, 2016 IL App (1st) 142941, ¶ 22. "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48,

54 (1999). We may not alter the defendant's sentence absent an abuse of discretion by the trial court. *Stacey*, 193 Ill. 2d at 209-10.

¶ 138    Aggravated robbery is classified as a Class 1 felony. 720 ILCS 5/18-1(c) (West 2014). Under section 5-4.5-30(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-30(a) (West 2014)), defendants convicted of a Class 1 felony are subject to a sentence "not less than 4 years and not more than 15 years." Cornejo received a seven-year sentence, which was within the lower range of his sentencing scheme. Accordingly, we must presume that his sentence was not excessive. *Busse*, 2016 IL App (1st) 142941, ¶ 27 ("If a sentence is within the statutory range, we presume it is not excessive.").

¶ 139    At the sentencing hearing, the State presented testimony suggesting that Cornejo was involved with a gang called the Harrison Gents, that he had received tattoos on his hands referring to the Harrison Gents, and that he had stolen Kevin's shoes specifically because they matched the colors worn by the Harrison Gents. The State also emphasized that Cornejo had been untruthful, both regarding his account of the offense at trial and his gang affiliation in his PSI.

¶ 140    In mitigation, the defense emphasized that Cornejo had no criminal record and also argued that there was no evidence linking the specific robbery with any gang-related activity. Additionally, the defense argued that Cornejo was "steadily working" in construction and highlighted Cornejo's close ties with his family. While the State requested a "substantial penitentiary sentence," the defense requested probation with monitoring, arguing that prison was not going to rehabilitate Cornejo.

¶ 141    The defense also placed a strong emphasis on defendant's young age, as he was 20 years old at the time of the offense. On appeal, defendant cites *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny as standing for the proposition that courts recognize the immaturity of emerging

adult defendants. There is no indication in the record that the circuit court did not consider defendant's status as an emerging adult offender when imposing its sentence. Further, we note that that the protections set forth in *Miller* clearly do not apply here, as defendant only received a sentence of seven years' imprisonment, which does not constitute a *de facto* life sentence. See *People v. Buffer*, 2019 IL 122327, ¶¶ 40-42 (stating a prison sentence of 40 years or less does not constitute a *de facto* life sentence in violation of the eighth amendment protections set forth in *Miller*).

¶ 142   Cornejo essentially asks that we substitute our judgment for that of the circuit court and reweigh the aggravating and mitigating factors presented to the circuit court, which we cannot do. *Alexander*, 239 Ill. 2d at 213. At the sentencing hearing, the circuit court found that seven years' imprisonment was appropriate, a sentence that was on the lower end of the applicable sentencing range, and stated that it disagreed with the defense that Cornejo's life "can go one way or another," because Cornejo had already "stamped *** on his hands" the Harrison Gents gang insignia. See *People v. Spears*, 256 Ill. App. 3d 374, 382 (1993) (stating that "gang affiliation is but one of the factors a judge may consider when sentencing").[5] The court then explained that it found the case "disturbing" because Cornejo "lured two teenagers to an alley" and went through the effort to ensure they would carry extra change to steal. *People v. Walker*, 113 Ill. App. 3d 1074, 1083 (1983) (the circuit court may consider the effect of a crime upon the victim in aggravation). Given these considerations, we find the circuit court properly weighed the aggravating and mitigating factors

---

[5]As we have acknowledged, prior to trial, the parties agreed that the offense was not "gang motivated," despite Cornejo's apparent gang affiliation. As to gang affiliation, section 5-5-3.2(a)(15) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(a)(15) (West 2014)) only expressly provides that the court may weigh in aggravation that "the defendant committed an offense related to the activities of an organized gang." Nonetheless, "a trial court is not limited to considering statutory aggravating factors but may consider any factor consistent with the statute that would tend to aggravate the offense." *People v. Ryan*, 336 Ill. App. 3d 268, 274 (2003). Therefore, consideration of Cornejo's gang affiliation was proper.

before it. We must presume the circuit court considered the mitigating factors that Cornejo raises on appeal, and nothing in the record affirmatively rebuts this presumption. *Busse*, 2016 IL App (1st) 142941, ¶ 22.

¶ 143   We find the circuit court did not abuse its discretion in imposing a seven-year sentence on Cornejo.

¶ 144                                   III. CONCLUSION

¶ 145   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 146   Affirmed.

**No. 1-18-0199**

| | |
|---|---|
| **Cite as:** | *People v. Cornejo*, 2020 IL App (1st) 180199 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-15746; the Hon. William T. O'Brien, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Michael H. Orenstein, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Kristin M. Estrada, Assistant State's Attorneys, of counsel), for the People. |