2022 IL App (1st) 191318-U
No. 1-19-1318

FIRST DIVISION
November 14, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 14 CR 5411 |
| PHILLIP ALLISON, | ) | |
| Defendant-Appellant | ) | The Honorable Ursula Walowski, Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* Judgment affirmed over defendant's challenge to the trial court's failure to include language in the self-defense jury instruction on the justifiable use of deadly force "to prevent a forcible felony" of unlawful restraint or aggravated battery on a public way; to the prosecution's comment about second degree murder during rebuttal argument; and to the trial court's response to the jury's questions as to the definition of mitigating and the definition of preponderance of the evidence

¶ 2    Defendant, Phillip Allison, was convicted of first degree murder and personally discharging a weapon during the commission of the offense for the shooting death of DeAngelo Shelton (Shelton), as well as aggravated battery for the shooting of Michael Miller (Miller). Defendant

asserts: (1) the trial court erred in refusing to provide a modified jury instruction for self-defense which would include the justifiable use of force to prevent a forcible felony; (2) he was prejudiced by the prosecution's comment during rebuttal argument; and (3) the trial court erred in failing to directly answer the jury's questions as to the definition of mitigating and the definition of preponderance of the evidence. For the foregoing reasons, we affirm defendant's convictions.

¶ 3                                       BACKGROUND

¶ 4      In December of 2013, Shelton was shot to death and Miller was injured when defendant fired two gunshots in their direction following a verbal disagreement between defendant and Shelton. The shooting occurred in the lobby of a multi-unit apartment building at 312 North Central, Chicago, Illinois, following the abrupt end to a party in a third-floor apartment. The partygoers, as well as others, began filtering downstairs to the lobby area. The State presented the testimony of four people, including Miller, Shelton's brother Tamar Sanders (Sanders), Shelton's girlfriend Jitrice "Nicole" Walker (Nicole), and Shelton's friend Cassandra Walker (Cassandra), who were present inside the lobby at the time of the shooting, as well as videotape of the shooting from a security camera in the lobby, and video from a nearby POD camera. In February of 2014, defendant was arrested in Texas and extradited to Illinois. In his defense, defendant argued that he fired the shots in self-defense. Alternatively, he requested that the jury receive an instruction for second-degree murder.

¶ 5                        **Michael Miller's Trial Testimony**

¶ 6      Around 11:00 p.m. on December 13, 2013, Miller arrived at the apartment building to purchase loose cigarettes from a woman who sold them out of her apartment. He described the apartment building as a large, courtyard building, At the entrance to the building, the exterior door was unlocked but a person would need to be "buzzed into" the interior lobby door. Both doors were

made of glass, allowing people to see into the lobby from the exterior. Beyond the interior door was a lobby with mailboxes and stairs.

¶ 7        When he arrived, two young ladies invited him to a party on the third floor. He initially declined the invitation but changed his mind after he bought his loose cigarettes. While he was there, he saw Shelton and Nicole. He knew Shelton from the neighborhood, was close friends with him, and knew that Nicole was Shelton's girlfriend. At the party, Miller had a "couple" drinks but was not drunk.

¶ 8        At one point, Shelton and three girls left the party to go to the liquor store. Later, Miller saw Shelton in the hallway outside this apartment. Shelton was arguing with the three girls and said that "he was going to f*** those hoes [sic] up." Shelton was also "tussling, swinging" with Nicole. The fight continued to the first floor, at which point, Nicole stumbled down the five or six steps to the lobby area. Miller saw Shelton and his brother, Tamar Sanders (Sanders), push Nicole outside through both sets of doors and told her to leave.

¶ 9        Shelton and Sanders then came back into the lobby area. Miller, who was standing on the stairway leading to the lobby floor, saw defendant and "a few girls" standing in the doorway in the lobby. He then saw defendant go outside and hand his cell phone to Nicole. He heard Shelton yell, "I hope you ain't trying to call no n****** over here to try to do something to me…" He heard defendant respond for Shelton to "be cool."

¶ 10       Miller heard defendant say that "there go the police" and then he saw "everyone" come back into the lobby of the apartment building. In the lobby, Miller saw Shelton, defendant, Tamar, two men who were with defendant earlier in the evening, along with some other women.  Shelton and defendant argued with each other with Shelton telling defendant, "stay out of my business…this is me and my girl" and defendant saying, "I am fint [sic] to get the f*** up outta here, somebody

get me the f*** up outta here." One of the women pushed the door open so defendant could leave. Shelton walked towards defendant. At this point, Miller was standing near Shelton in the lobby by the interior entrance door. He heard defendant tell Shelton "get me the f*** out the building…" As defendant moved towards the door, a girl opened the door for him. Miller heard a girl say something to Shelton, but Miller did not recall which girl was speaking and did not recall what she said. Miller and Shelton took a step towards defendant. When defendant reached the exterior door, Miller saw him reach inside his coat pocket with this right hand and pull out a handgun. Miller saw defendant fully extend his right arm and fire the gun twice.

¶ 11     Both Shelton and Miller were shot. Miller did not hear anyone say anything to defendant right before defendant pulled out his gun and fired it. He denied that he heard anyone, including Shelton, threaten to kill or murder defendant. Miller testified that he did not have a weapon that night, and he did not see Shelton, Tamar, or anyone else with a weapon that night.

¶ 12     Miller was taken via ambulance to Mount Sinai Hospital with one gunshot wound to his right lateral gluteus maximus and one gunshot wound to the left lower quadrant of his abdomen. During treatment for his injuries, a bullet was recovered from the exit wound near his right buttock. After surgery, he was hospitalized for a week and had physical therapy to help to regain use of the right side of his body.

¶ 13     He subsequently identified defendant as the shooter from a photo array on February 7, 2014, and during a physical lineup on February 25, 2014. Miller admitted that he was convicted of possession of cannabis with intent to deliver and robbery in 2008 and robbery in 2011. While this case was pending, in 2015, he was arrested for violation of an order of protection and telephone harassment with that case subsequently stricken off call with leave to reinstate. In 2015, he was also arrested for domestic battery, and those charges were subsequently dropped when the victim

chose to not testify. He testified that the State never promised to dismiss the charges against him in exchange for his testimony.

¶ 14                                **Tamar Sander's Trial Testimony**

¶ 15      Tamar Sanders testified that he went to the apartment building that night to meet with Shelton, his brother. Initially, Sanders and Shelton were planning to later go to a video recording for Sanders' music video, but while there, Sanders found out that the video had been cancelled. Shelton did not go to the party on the third floor, and instead, he watched a movie at a friend's apartment on the second floor. At one point, Sanders called Shelton and later gave him some money to purchase alcohol. Approximately 45 minutes later, he heard Shelton arguing in the hallway, and when he went to look, he saw Shelton, Nicole, and another female "arguing and tussling…" Shelton asked Sanders to help him get them out of the building. Shelton saw Nicole trip and fall down the steps leading to the lobby.

¶ 16      Shelton and Sanders were able to get Nicole out of the apartment building. After Sanders and Shelton returned to the lobby, Sanders did not see defendant lend his cell phone to Nicole, but he heard Shelton yell, "Don't call nobody. You was [sic] trying to call people over here." Sanders did not hear defendant's response, but saw defendant come back to the lobby. Sanders heard Shelton tell defendant to "[m]ind your business." Sanders did not know defendant before this day. Sanders tried to calm down his brother by standing between Shelton and defendant, and Sanders pushed Shelton away. Defendant turned to leave the building and then turned back around.

¶ 17      At that point, Sanders, who was standing next to Shelton, saw defendant pull a gun out of his right coat pocket and he heard two gunshots. Defendant ran out the door and into a red sports car parked on the street in front of the apartment building. He never heard Shelton or anyone else threaten to harm or murder defendant. He also never heard Shelton tell people in the lobby, after

the police drove past, to get inside because there were too many drugs and guns in the building. Sanders denied that anyone was selling drugs in the lobby or the building that night. Sanders admitted that, right before the shooting, he raised his shirt, but he explained that he was adjusting his pants and he thought, at that point, the argument had stopped. Sanders testified that the surveillance videotape showed him going back towards that stairwell and then adjusting his shirt.

¶ 18    Sanders went to the Stroger Hospital where he learned that Shelton had died from his gunshot wound. While at the hospital, he was interviewed by Chicago Police Detectives Richard Green and Nicholas Spanos, and he told them what he saw that night. Sanders testified that he did not have a weapon with him that night, and he did not see anyone else with a weapon. On January 24, 2014, Sanders identified defendant in a photo array as the person who shot Shelton.

¶ 19    **Jitrice "Nicole" Walker's Trial Testimony**

¶ 20    Jitrice "Nicole" Walker testified that she was at that apartment building that evening with Shelton and her friends, Teneshia and Quilla. She had been dating Shelton for the past two months. She recalled that there was a party but "[e]verything is like a blur" as to what happened that night. She recalled that she had been drinking alcohol, but did not drink "a lot[.]" She also recalled that she and Shelton got into a verbal argument "over something[,]" and that, when they were in the lobby, Shelton told her to leave. She left the apartment building on her own accord and was not escorted out by anyone. She denied that Shelton physically forced her to leave the building. Upon leaving the building, she did not recall asking for or using anyone's cell phone. She denied seeing anything that happened between defendant and Shelton inside the lobby, although she recalled seeing Sanders and one of the girls from the party in the lobby and seeing that Sanders and defendant were conversing with each other. She did not remember seeing anyone shoot at Sanders, but she recalled the shooter leave the apartment building and get into a red car.

¶ 21 After the shooting, she went to the hospital to check on the condition of Shelton and agreed to go with a police detective to a police station. Sergeant Gregory Jacobson, who was working as a detective at the time, spoke with Nicole at the hospital, and Nicole admitted that she willingly agreed to accompany him to a police station. At trial, she either denied or did not remember various aspects of the conversation that she had with the detective.

¶ 22 **Sergeant Gregory Jacobson's Trial Testimony**

¶ 23 Sergeant Gregory Jacobson testified that when he interviewed Nicole at the police station, she told him that she was in the lobby with Shelton and Teneshia Horton (Teneshia) and they were jokingly calling each other "bitches and whores." Teneshia left the building and drove away. Nicole exited the lobby and, because she needed to call her half-sister, she asked to borrow a cell phone from a group of people who were near her. A woman took a cell phone from a male in the group and handed it to her. While she was making her call on the cell phone, she saw Shelton and "the shooter" engaging in a verbal argument. She heard the shooter say something to Shelton about the comments that Shelton made to Nicole and Teneshia, and Shelton told him to mind his own business. Nicole told the detective that the shooter removed a handgun from his waistband and fired it at Shelton and Miller. She saw the shooter leave the lobby and drive away from a red car parking in front of the apartment building.

¶ 24 **Assistant State's Attorney Yolanda Lippert's Trial Testimony**

¶ 25 Assistant State's Attorney Yolanda Lippert (ASA Lippert) testified that on February 7, 2014, she spoke with Nicole, who was accompanied by her mother, at the police station in the presence of a police detective. During the interview, Nicole agreed to have her statement memorialized in a videotaped statement. After the police detective left the interview room, ASA Lippert asked her how she had been treated by the police, and Nicole informed her that she had not been threatened

by anyone and had been treated well by the police. She testified that Nicole never reported to her that the police detectives had threatened to put her in jail or to charge her with a crime if she did not provide a videotaped statement. Nicole's videotaped statement was admitted into evidence and played for the jury. While Nicole was at the police station, she was shown a photo array, but she was unable to identify anyone and stated that she would be more comfortable viewing a physical lineup.

¶ 26                                    **Cassandra Walker's Trial Testimony**

¶ 27        Cassandra went to the party that night, hosted by her friend, Tangie Hamilton (Tangie), and she saw Nicole and defendant. She also knew defendant by the nicknames of "Sincere" and "Nuggie."[1] Cassandra recalled that Tangie called defendant to come to the party, and that he arrived with his friend, Josh. Cassandra had never met Josh before this night. At one point, Tangie told everyone at the party that they had to leave her apartment. Cassandra went down to the lobby of the apartment building and saw defendant and Shelton arguing with each other. The exterior door was open, and defendant said that he "wanted all his people to get out the building." She heard Shelton tell defendant to close the door. She also saw Shelton and Nicole physically fighting with each other. She heard Shelton ask defendant "what is he looking at."

¶ 28        She further testified that when Nicole stepped outside to use the cell phone, defendant was holding the door open for people to leave the building. She heard defendant and Shelton arguing with each other and tried to calm them down. When she realized that she could not calm them down, she stepped outside. At one point, she saw defendant walk back into the lobby, and then she heard gunshots. She did not see who fired the gun and did not see anyone with a gun or weapon

---

[1] The nickname is also spelled "Nugy" at other parts of the record.

that night. However, when shown a photo array by Chicago police detectives, she identified defendant's photo by his nickname, "Nuggie," as the person who shot Shelton.

¶ 29    Cassandra's grand jury testimony was admitted as substantive evidence. In it, she identified defendant as the shooter and testified that, at the time of the shooting, no one else had a weapon. She stated that she saw defendant walking away, and Shelton said something to him. Defendant turned around and fired two gunshots into the lobby area with his arm fully extended. She admitted that she identified defendant as the shooter from a photo array.

¶ 30                                    **Additional Investigation**

¶ 31    An autopsy of Shelton's body showed that his cause of death was a gunshot wound to his back, and the manner of death was homicide. The police recovered from the scene two fired cartridge casings and one metal fragment, suspected to be a fired bullet. It was stipulated that the two 9-millimeter Luger cartridge casings recovered from the scene could not be identified or eliminated as having been fired from the same firearm. It was further stipulated that the two fired bullets, one recovered at the scene and the other recovered during surgery to Michael Miller, were 9-millimeter/.38 caliber bullets, but that they could not be identified or eliminated as having been fired from the same firearm.

¶ 32    The video taken from a POD camera located at the southwest corner of Central and Fulton, approximately one-half block away from the apartment building, showed a vehicle, possibly a Dodge Challenger, at 1:23 a.m. on December 14, 2013, going southbound in the northbound lanes of Central and proceeding south through the intersection and out of view of the camera.

¶ 33    Donna Brown-Hudson, the property manager for this apartment complex, downloaded a copy of the security video from the lobby area. There was one camera facing the front door and a second one facing the lobby showing the area near the mailboxes. The videotape contained a

videorecording and did not contain an audio recording. Defendant did not include the videotape recording, or any other exhibits, in the record on appeal.

¶ 34    During the State's case, however, several witnesses testified to what they saw when viewing the videotape, pausing at certain parts of the videotape for the witnesses to explain. During Miller's testimony, he explained that the videotape showed a woman in a yellow shirt standing by defendant in the area near the front door. Another portion of the videotape showed the victim arriving in the lobby area and then Shelton and Sanders pushing Nicole out of the building. At that point, defendant was on the right side of the video. Another portion of the videotape showed Shelton, Sanders and defendant coming back into the building and Shelton and Sanders going to the top of the stairs in the lobby close to Miller's location, but Miller was standing outside the view of the camera. Another portion of the videotape showed many people coming back into the lobby of the building, and Miller explained that this occurred after defendant said, "there go the police." Miller explained that the videotape showed that when defendant began to leave the building, Miller was by the mailboxes, Shelton was in front of the door, and Tamar was behind Shelton. Miller further testified that the video showed defendant holding a gun with his arm extended and defendant's friend was standing against the glass window, trying not to get shot. The next part of the video showed Shelton on the floor after getting shot and Miller to the left, laying on the floor, having been shot. Miller testified that the video showed defendant leaving the building and Nicole coming back into the lobby.

¶ 35    Nicole testified as to what she saw on the video. She testified that the video showed a person pushing her out the door. She described another part of the videotape as showing her standing just outside the glass door at the time of the shooting and her re-entering the building after Shelton and Miller were shot.

¶ 36    Cassandra Walker identified herself in the videotape as, at one point, standing to the left of defendant and Josh. Cassandra explained that the video showed her, at one point, standing between defendant and Shelton, and another point in the videotape showed defendant standing in front of her and Allenwesia Clay, who testified for the defense at trial, was near them in the lobby. The videotape was paused again, and she explained that it showed Josh next to her and defendant next to her with a gun in his hand. They are inside the vestibule between the two doors at the time.

¶ 37    In addition, Sanders identified himself in the video as walking past Shelton and standing behind him. Sanders testified that the video showed when he told Shelton to leave defendant alone. Sanders also testified that the video showed him walking up the stairs and "adjusting his shirt."

¶ 38    After an arrest warrant was issued for defendant, he was arrested in Texas on February 10, 2014. The police were unable to locate Nicole or Cassandra at that time for them to be able to view a physical lineup. Defendant's arrest photo shows that he had a tattoo on his stomach that said, "Nuggie."

¶ 39    **Defense Case**

¶ 40    Defendant testified in addition to presenting the testimony of an eyewitness, Allenwesia Clay, his wife Lindsy Allison, and several other character witnesses.

¶ 41    **Defendant's Trial Testimony**

¶ 42    Defendant testified that he was home with his wife when Cassandra called him and asked him to pick her up from a party because she was drunk. When he and Tremayne Mattox, who was staying with defendant at the time, arrived at the party around midnight, he and the other people were subsequently kicked out of the party. Defendant walked into the hallway and got a phone call from his wife asking him when he would be home. He told her soon. Defendant and Tremayne Mattox walked towards the staircase and heard an argument between Shelton and Nicole. He saw

Nicole falling down the stairs from the third floor to the second-floor landing. Defendant walked to the lobby of the apartment building and saw Shelton and another male push Nicole out of the building and then walk back into the lobby. Defendant walked outside and asked Nicole if she was okay. She said yes and asked to borrow his cell phone.

¶ 43        At that point, when defendant saw a police car drive by, he pounded on the door because he was a felon in possession of a gun. Allenwesia was in front of the door, tried to open it, but Shelton ran past her and closed the door. Tamar came to Shelton's side and pushed his hand out of the way. Shelton "shoved" open the door and said to defendant, "why the f*** is you banging on the door. We're hustling in here." Defendant knew that "hustling" meant that he was selling drugs. Defendant entered the lobby, and Shelton told him, "I own the building, I'm a security guard, I have a right to put people in and out." Defendant told him that he needed to learn how to treat women, and Shelton told defendant to "mind your own business."

¶ 44        Defendant testified that Shelton appeared hostile and was gesturing with his hands down to his side "as if he's like pointing a gun." Defendant thought that Tamar Sanders was with Shelton and "backing him up."   Defendant told him "You're right. I'm wrong. I'm gone." Defendant turned around to try to leave, but Allenwesia was in front of the door. When defendant asked her to open the door, she would not open it and remained inside the lobby for another three to four minutes. He was under the impression that he could not leave and that he was being kept there. As defendant turned to leave for the second time, he heard Shelton tell him, "I'm about to murk you in this mother******." Defendant knew that "murk" meant to kill someone.

¶ 45         At that point, defendant pulled out of his gun because he thought Shelton was reaching for a gun when he saw Shelton turning his upper body to the right and reach with his right hand. He also thought Miller had a gun when he saw Miller had his left hand in his pocket. Defendant also

thought Tamar Sanders was reaching for a gun when Sanders, who was standing on the staircase, lifted up his shirt and reached behind his back. Defendant testified that all of this occurred within one second of his decision to fire his semiautomatic handgun two times towards Shelton and Miller. He then turned around and left the scene in his car, which was parked in front of the apartment building. Tremayne left with him. Defendant went home, woke up his wife, and told her "bits and pieces" of what happened. Later, he broke the gun into pieces and disposed of it. He and his wife moved to Texas after the shooting, but he testified that they had already planned to move there before the shooting.

¶ 46      On cross-examination, defendant testified that he had a gun with him when he went to the apartment building that night, and he never saw anyone else with a gun that night. Defendant denied that he started to argue with Shelton when defendant was still outside the apartment building. He testified that he was banging on the front door, and Shelton opened the door to let him into the lobby. He admitted that he had four friends in the lobby with him, and Shelton had two friends. He also admitted that while he was standing in the lobby, he was not afraid of Shelton or Shelton's friends. He described himself as being six foot four inches tall and Shelton was five foot nine inches tall.

¶ 47      Defendant further admitted that when he walked through the interior door to the vestibule, Allenwesia and Cassandra were right next to him, and he was not afraid at this point. He testified that before he fired the shots, Allenwesia was holding the door closed so he could not exit the building. He admitted that he could have pushed her away, but he did not do so. He and Tremayne got into defendant's car and drove away from the scene. He identified his car in the POD video.

¶ 48                          **Allenwesia Clay's Trial Testimony**

¶ 49    Allenwesia Clay testified that, before that evening, she did not know Shelton, but she had known defendant for about two months. She witnessed the argument between Shelton and Nicole and, while inside the vestibule of the lobby, she saw Shelton and Sanders push Nicole out the door. When defendant let Nicole borrow his cell phone, Shelton told defendant to stay the "F up out of his business." After a police car drove by, "everybody" came back into the building, including defendant. While she was again standing in the vestibule of the lobby, she heard Shelton say, "nobody coming in and out of this building because we're hustling in here" and told defendant to "stay the f*** out of his business." She saw defendant turn around to walk outside, and then heard Shelton tell him that he was going to "murk" "him a mother******." While she initially testified that she "wasn't paying attention" at the time of the shooting, on cross-examination, she testified that she was standing next to defendant, she saw him pull a gun out of his coat pocket and fire two or three shots into the lobby.

¶ 50    Defendant also presented the testimony of Chiquilla Murphy, Miller's ex-girlfriend, who signed a complaint for domestic battery against Miller after Miller punched her in the face on June 30, 2015. Ali Boyd testified that on June 29, 2011, DeAngelo Shelton, along with a group of men, approached him, beat him up, went through his pockets, and robbed him of an earring and money.

¶ 51    Defendant presented the testimony of three character witnesses – Lindsy Allison, Tasman Evans and Janelle Daniels – who testified that defendant was a peaceful person. Lindsy Allison, defendant's wife, also testified that on the night of the shooting, defendant left the home to "take care of a friend[.]" She did not know that he possessed a gun when he left the house. After he left, she called him to see if he would be coming home soon, and he said yes. Later, defendant woke her up and told her that he tried to help somebody, it went wrong, and he was in trouble.

Afterwards, they both left for Texas. She was aware that defendant had previously been convicted of home invasion in 2007.

¶ 52    During the jury instruction conference, the State submitted IPI 24-25.06, which provided:

> A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself.

¶ 53    Defendant asked for the trial court to submit this instruction with the additional phase, "or the commission of unlawful restraint," at the end of the second paragraph. Defendant argued that there was evidence to support a conclusion that deadly forced was being used to prevent a forcible felony, in this case, unlawful restraint. In conjunction with this additional language, defendant also asked that the jury be given the definition of unlawful restraint. Defendant pointed to evidence that, as he was turning to leave the building, Shelton said that he was going to "murk you in this mother*****[,] and Shelton's "general constraint of people moving in and out[.]" The trial court determined that the facts did not support this instruction.

¶ 54    During rebuttal argument, the following colloquy occurred:

> [Prosecutor]: "The defendant's arguing today for second-degree murder because he knows what he did. He knows what he did, and he knows that you see on the video and you know what he did. So he has no other choice but to argue that he was justified in shooting. He can't say he didn't do it. He has no other choice. Guilty on a second-degree murder in this case will be saying that what the defendant did was okay.
>
> [Defense counsel]: Objection.

The Court: All right. State, let's move on, if you can.

[Prosecutor]: It is not okay to shoot someone in the back. It is not okay to shoot somebody for something that they just said to you. It is not okay to shoot someone for having a hand in their pocket. It is not okay to shoot someone for adjusting their shirt. It is not okay to shoot people when you don't see a gun or a weapon. You are not in imminent harm when you don't see anything.

This defendant is not justified in shooting these individuals. Do not compromise on the lesser charge of second degree murder and give him what he wants."

¶ 55    During jury deliberations, the jury sent out a note, "Please define mitigating and please define preponderance of the evidence." Defendant argued that the request for a definition of "mitigating" was "nonsensical" because the jury instructions already provided a definition and suggested that the trial court "either reinstruct them as to what the mitigating factor is or just say look at your instructions." He further suggested that the trial court to provide the jury with the "civil definition of preponderance, which is basically more likely than not, and that's the - - that is the legal definition so I think that should be given." The State argued that the instructions already contained the definitions of both terms and asked the trial court to refer the jury back to their provided jury instructions. The trial court agreed with the parties' suggestion that the jury had already received definitions of both terms, and it decided to tell the jury, "You have received all of the instructions applicable in this case. Please continue to deliberate."

¶ 56    The jury found defendant guilty of first degree murder and personally discharging a firearm that proximately caused the Shelton's death, as well as aggravated battery for the shooting of Miller. Defendant filed a motion for a new trial, in which he asserted, without further explanation, that the trial court erred in refusing to instruct the jury regarding "use of force to prevent unlawful

restraint or aggravated battery." At the hearing on the motion, defendant argued that there was evidence to support the inclusion of the offense of aggravated battery because he "testified that he believed he was being threatened possibly with a gun, no gun was ever found." Alternatively, he argued that Shelton had committed an unlawful restraint where defendant "was told to come - - you know, come in, come out, go there, go where." In response, the State argued that the video recording and the witness testimony showed defendant standing at the exit door without anyone blocking the exit at the time that he shot Shelton and Miller, there was no testimony that defendant was told to enter or exit the building, and there was no evidence that defendant was touched by anyone or that anyone else, besides defendant, was armed with a weapon that night. The trial court denied defendant's motion for a new trial, finding that the jury instructions as given were proper and adding this additional language would have been confusing for the jury where there's really no evidence…"

¶ 57    Defendant also argued during the hearing on his motion for a new trial that the trial court erred in its response to the jury note because the jury "indicate[d] such confusion about the law" that "something need[ed] to be done." Defendant suggested that the trial court should have "brought out [the jury]" and "re-read" the relevant instructions. Defendant further suggested that the trial court should have given the civil definition of preponderance of the evidence "since it is in accord with the law and with the criminal definition."

¶ 58    The trial court denied defendant's motion for a new trial on these grounds. The trial court rejected defendant's suggestion that the jury note showed that the jury was confused or did not understand the applicable law. Rather, the trial court posited that the jury's question may have indicated that the jury "want[ed] to make sure that there is no…specific legal something out there different than what they have before them."

¶ 59　　The trial court subsequently sentenced defendant to consecutive terms of 30 years' imprisonment for first degree murder, 25 years' imprisonment for personal discharge, and 6 years' imprisonment for aggravated battery with a firearm.

¶ 60　　　　　　　　　　　　　　　　ANALYSIS

¶ 61　　　　　　　　　　　　**I. Self-defense Jury Instruction**

¶ 62　　Defendant contends that, while the jury was instructed as to his affirmative defense of self-defense, the trial court erred by refusing to include language in the self-defense jury instruction on the justifiable use of deadly force "to prevent a forcible felony." He contends that he presented evidence that Shelton was engaged in and attempting to engage in the forcible felonies of unlawful restraint and aggravated battery on a public way at the time of the shooting. Initially, the State contends that defendant forfeited the inclusion of an instruction for a forcible felony of aggravated battery on a public way. Substantively, the State contends that when the jury was instructed regarding self-defense to protect himself from great bodily harm or death, it necessarily considered the same evidence in determining whether defendant committed a forcible felony. The State further contends that the felony offense of aggravated battery on a public way does not meet the definition of a "forcible felony."

¶ 63　　Initially, we review this contention for forfeiture. As to defendant's assertion that the jury should have received a jury instruction regarding the "forcible felony" of aggravated battery on a public way, we recognize that defendant forfeited this claim where he only made this argument at the hearing on his posttrial motion for a new trial. During the jury instruction conference, he limited his request to the inclusion of the offense of unlawful restraint. Our supreme court has found that a defendant forfeits his or her right for review of a jury instruction if he or she failed to object to the instruction at trial and did not raise the issue in a posttrial motion. *People v. Anderson*, 2012

IL App (1st) 103288, ¶ 43 (citing *People v. Sargent*, 239 Ill.2d 166, 188-189 (2010). Rule 451(c) provides that "substantial defects [in criminal jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." Ill.S.Ct.R.451(c) (eff. April 8, 2013). This rule is coextensive with the plain-error clause of Illinois Supreme Court Rule 615(a) (eff. Feb. 6, 2013); *People v. Sargent*, 239 Ill.2d 166, 189 (2010). The plain-error doctrine, a narrow and limited exception, allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill.2d 551, 565 (2007).

¶ 64    In seeking plain-error review, a defendant has the burden of persuasion. *People v. Naylor*, 229 Ill.2d 584, 593 (2008). Here, defendant has failed to meet his burden of establishing plain error where he failed to argue for plain-error review. "A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion." *People v. Hillier*, 237 Ill.2d 539, 545 (2010). As the supreme court explained in *People v. Nieves*, 192 Ill.2d 487, 502-03 (2000), when a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review. Therefore, we find that defendant forfeited review of his claim regarding the failure to instruct the jury regarding the forcible offense of aggravated battery on a public way.

¶ 65    Forfeiture aside, we also find that there was no error in the instant case in the trial court's instruction of the jury. "The erroneous omission of a jury instruction only rises to the level of plain error when its omission creates a serious risk that the jury incorrectly convicted the defendant

because the jurors did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Thompson*, 2017 IL App (5th) 120079-B, ¶ 25 (citing *People v. Hopp*, 209 Ill.2d 1, 8 (2004). The supreme court has recognized that "[t]his standard is a difficult one to meet." *People v. Sargent*, 239 Ill.2d 166, 191 (2010). Here, defendant received the jury's informed consideration of his self-defense theory by the instructions it received.

¶ 66        Jury instructions are intended to convey to the jury the correct principles of law applicable to the evidence submitted so that the jury can "'arrive at a correct conclusion according to the law and the evidence.'" *Anderson*, 2012 IL App (1st) 103288, ¶ 40 (quoting *People v. Pinkney*, 322 Ill.App.3d 707, 717 (1st Dist. 2000). Both parties are entitled to have a jury instructed on their theories of the case and, generally, an instruction is warranted if there is even slight evidence to support it. *People v. Miller*, 2021 IL App (1st) 190060, ¶ 44 (citing *People v. Jones*, 175 Ill.2d 126, 131-32 (1997). In addressing the adequacy of jury instructions, the reviewing court must consider the jury instructions in their entirety to determine whether they fully and fairly cover the law. *People v. Hoffman*, 2012 IL App (2d) 110462, ¶ 8.

¶ 67        A reviewing court will generally review jury instructions only for an abuse of discretion. The decision whether to give the instruction is within the sound discretion of the trial court; however, there must be evidence in the record to justify giving a particular instruction. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 33 (citing *People v. Hammonds*, 409 Ill.App.3d 838 (1st Dist. 2011). "'The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law.'" *Bailey v. Mercy Hospital and Medical Center*, 2021 IL 126748, ¶ 42 (quoting *Studt v. Sherman Health Systems,* 2011 IL 108192, ¶ 13). While jury instructions are reviewed for an abuse of

discretion, our standard of review is *de novo* when the question is whether the applicable law was accurately explained to the jury. *Anderson*, 2012 IL App (1st) 103288, ¶ 34.

¶ 68    Here, a self-defense instruction was given to the jury which provided that force likely to cause death or great bodily harm is justified to prevent like injury to oneself. Illinois Pattern Jury Instruction (IPI) 24-25.06 states:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force.
>
> [However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [(imminent death or great bodily harm to [(himself) (another)] (the commission of ---)].]" Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th Ed. 2000) (hereinafter, IPI Criminal 4th No. 24-25.06).

¶ 69    The committee notes states: "When applicable, insert in the blank forcible felony." Committee Note to IPI Criminal 4th No. 24-25.06. Here, the trial court agreed with the State to instruct IPI Criminal No. 24-25.06 to instruct the jury on the justifiable use of deadly force to prevent imminent death or great bodily harm to himself. During the jury instruction conference, however, trial court denied defendant's request to provide a version of IPI 24-25.06 that included the additional phrase, "or the commission of unlawful restraint," at the end of the second paragraph, as well as a request to include a jury instruction defining unlawful restraint.

¶ 70    Defendant argues that the trial court erred in refusing his request for inclusion of the provision that deadly force may be used to prevent the commission of a forcible felony where the victim's actions constituted unlawful restraint and aggravated battery on a public way, both of which constituted a "forcible felony." Defendant contends that his theory of self-defense was that he acted to prevent the commission of both of these forcible felonies upon himself.

¶ 71    We recognize that several courts have reviewed this same contention before and rejected it. For instance, in *People v. Easter*, 102 Ill.App.3d 612 (1st Dist. 1981), the defendant argued that she was denied a fair trial because the trial court refused instructions relevant to her theory of self-defense. In that case, the defendant sought to include language "or the commission of a forcible felony" relating to the victim committing an aggravated battery in a public way. In rejecting the defendant's argument, the court found:

> "…The evidence relied on by defendant to support her contention that the omitted language should have been included is essentially the same as that on which the jury must have relied in determining that defendant was guilty of voluntary manslaughter. The jury's verdict necessarily reflects the jury's determination that defendant's belief that the use of deadly force was necessary to protect himself from imminent death or great bodily harm was unreasonable. In view of this determination, it is untenable to suggest that the jury would have found that defendant's use of deadly force when faced with a battery while on a battery way was reasonable." *Easter*, 102 Ill.App.3d at 983.

¶ 72    Likewise, in *People v. Chamness*, 129 Ill.App.3d 871 (1984), the defendant was convicted of armed violence, aggravated battery and attempt murder. The trial court in that case gave a self-defense instruction pursuant to IPI 24-25.06 stating that force likely to cause death or great bodily harm is justified to prevent the same injury to oneself but did not include the "forcible felony" language of that instruction. *Chamness*, 129 Ill.App.3d at 875. On appeal, the defendant argued that this failure to include the "forcible felony" language amounted to reversible error. However, in rejecting the defendant's argument, the *Chamness* court stated,

> "When a jury determines whether a defendant acted to protect himself from great bodily harm or death, it necessarily considers the same evidence which would be involved in a determination of whether the defendant acted to prevent the commission of an attempted murder or aggravated battery upon himself. There is no logic in the suggestion that a jury which found that a defendant was not protecting himself from great bodily harm or death could find that defendant was trying to prevent an attempted murder or aggravated battery from being committed upon himself…"

¶ 73   *Id*. at 876. Thus, the court determined that the inclusion of the "forcible felony" language in the instruction was not warranted. *Id*.

¶ 74   This holding has been followed and consistently reaffirmed in several similar cases, including *People v. Maggio*, 2017 IL App (4th) 150287, ¶¶ 31-33 ("Because the jury apparently determined defendant was not protecting himself from great bodily harm or death, it could not have found defendant was attempting to protect himself from an aggravated battery or aggravated discharge of a firearm, as the conduct necessary to commit either offense would necessarily be likely to cause great bodily harm or death."); *People v. Jackson*, 304 Ill.App.3d 883, 891-92 (1st Dist. 1999) (same for forcible felony offense of criminal sexual assault); *People v. Flores*, 282 Ill.App.3d 861, 862 (1st Dist. 1996) (same for forcible felony offense of aggravated battery on a public way); *People v.* Wilburn, 263 Ill.App.3d 170, 177-178 (1st Dist. 1994) (same for forcible felony offense of aggravated battery based upon the use of a deadly weapon); (*People v. Renehan*, 226 Ill.App.3d 453, 470 (1st Dist. 1992) (same for felony offense of voluntary manslaughter and aggravated battery based upon the use of a deadly weapon); *People v. Hanson*, 138 Ill.App.3d 530, 539-40 (5th Dist. 1985) (same for felony offense of aggravated battery); and *People v. Townsend*, 136 Ill.App.3d 385, 393 (1st Dist. 1985) (same for aggravated assault and attempt aggravated battery). As such, defendant received the jury's informed consideration of his self-defense theory based upon the forcible felony offenses of unlawful restraint and aggravated battery on a public way.

¶ 75   Further, the felony offense of aggravated battery, when based on the underlying offense of a simple battery that occurs on or about a public way (720 ILCS 5/12-3.05(c) (West 2012), is not a forcible felony. See *People v. Rodriguez*, 258 Ill.App.3d 579, 585 (1994) ("Simple battery upon a public way intentionally was omitted from the definition of forcible felony.") As we previously recognized when addressing the same argument, the legislature limited the definition of a "forcible

felony" to include "…aggravated battery resulting in great bodily harm or permanent disability or disfigurement…" 720 ILCS 5/2-8 (West 2008). See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 67; Accord *People v. Leahy*, 229 Ill.App.3d 1070, 1075 (2nd Dist. 1992) ("When the legislature designated a subset of aggravated batteries that would justify deadly force, it clearly demonstrated that it did not mean to provide a justification in the case of *any* battery upon a public way.") Therefore, we believe that simple battery on a public way, elevated to aggravated battery under section 12-3.05(c), does not constitute a forcible felony of the type that would justify using deadly force pursuant to self-defense.

¶ 76        In sum, we find no error in the self-defense instructions given at defendant's trial.

¶ 77                                **II. Rebuttal Argument**

¶ 78        We next address defendant's claim that the State made one improper comment during rebuttal argument. "[I]t is well established that a prosecutor is allowed wide latitude in closing argument [citation] and it is entirely proper for the prosecutor, during closing argument, to comment on the evidence offered at trial and to draw legitimate inferences from the evidence, even if those inferences are detrimental to the defendant." *People v. Desantiago*, 365 Ill.App.3d 855, 866 (1st Dist. 2006). Moreover, the State is permitted to remark upon matters of common knowledge and experience during closing arguments. *People v. Runge*, 234 Ill.2d 68, 146 (2009). "While a prosecutor may not make arguments or assumptions that have no basis in evidence, improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused." *People v. Sutton*, 353 Ill.App.3d 487, 498 (1st Dist. 2004). "In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety, and the complained-of remarks must

be placed in their proper context." (Internal quotation marks omitted.) *People v. Caffey*, 205 Ill.2d 52, 104 (2001).

¶ 79    Defendant seeks for this court to review this issue pursuant to *de novo* review, while the prosecution seeks for this court to utilize an abuse of discretion standard. We recognize that there is currently a split in the appellate court regarding which standard of review should apply to issues regarding prosecutorial misconduct in closing argument. This split stems from two statements made by the Illinois Supreme Court in *People v. Wheeler*, 226 Ill.2d 92, 121 (2007), which suggested that the *de novo* standard applies, and *People v. Blue*, 189 Ill.2d 99, 128 (2000), which suggested that the abuse of discretion standard applies.

¶ 80     However, in *Phagan*, this district followed *Blue* and found that the abuse of discretion standard is the proper standard, as "the trial judge is present for the entire trial, * * * has the benefit of 'hearing the remarks of counsel on both sides' and is better situated to determine whether anything that happened or was said justifies the challenged remark." *People v. Phagan*, 2019 IL App (1st) 153031, ¶¶ 48-50 (quoting *North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486, 502 (1892)); See also *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 128. In making this determination, we noted that "the pedigree for an abuse of discretion standard spans more than a hundred years." *Id*. at ¶ 49 (citing *People v. McCann*, 247 Ill. 130, 170-71 (1910), and *Bulliner v. People*, 95 Ill. 394, 405-06 (1880)).

¶ 81    Application of the *de novo* standard, however, "does not enjoy similar historical support," as the court in *Wheeler* based its application of the *de novo* standard on *People v. Graham*, 206 Ill.2d 465 (2003); *Phagan*, 2019 IL App (1st) 153031, ¶ 51. As we observed, the *Graham* court referenced two different issues raised by the defendant, one of which was the defendant's challenge to the prosecutor's remarks in closing argument, and stated, "We review this legal issue *de novo*,'"

without distinguishing the two claims. *Id*. (quoting *Graham*, 206 Ill.2d at 474). Moreover, the *Graham* court considered the prosecutorial misconduct issue under the framework of an ineffective assistance claim. *Id*. ¶ 52 (citing *Graham*, 206 Ill.2d at 476-77)), and ineffective assistance claims are reviewed *de novo*. *Id*. (citing *People v. Demus*, 2016 IL App (1st) 140420, ¶ 27)). Therefore, it was unclear whether *Graham* was applying *de novo* standard as to the prosecutorial misconduct claim or the ineffective assistance claim. *Id*.

¶ 82    We agree with our reasoning in *Phagan* and conclude that defendant's prosecutorial misconduct claims are more appropriately reviewed under the abuse of discretion standard. *Id*. ¶¶ 48-50. Under this standard, "[t]he regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *Blue*, 189 Ill.2d at 128.

¶ 83    Moreover, defendant concedes that he failed to properly preserve his argument regarding the alleged impropriety of these remarks by failing to include this issue in his posttrial motion for a new trial. It is well-established that to properly preserve an issue for appeal, a defendant must object to the purported error at trial and specify the error in a posttrial motion. *People v. Bannister*, 232 Ill.2d 52, 65 (2008); *People v. Enoch*, 122 Ill.2d 176, 186 (1988). He asks this court to review it under the purview of both prongs of the plain error doctrine. As previously noted, the plain-error doctrine bypasses normal forfeiture principles and allows us to review unpreserved claims of error in certain circumstances. *People v. Thompson*, 238 Ill.2d 598, 613 (2010). This doctrine allows a reviewing court to consider unpreserved issues where the evidence is so closely balanced that the error alone severely threatened to tip the scales of justice against the defendant (*People v. Herron*, 215 Ill.2d 167, 186-87 (2005)), or the error was so serious that it affected the fairness of the

proceeding and challenged the integrity of the judicial process where the error affected a defendant's substantial rights. *Id.* at 187. Ill.S.Ct.R. 615(a) (eff. Jan. 1, 1967). In any event, a defendant must preliminarily establish there was error. *Id.* Consequently, our first task is to determine whether defendant has established that there was error. *People v. Herron*, 215 Ill.2d 167, 187 (2005).

¶ 84    Defendant suggests that the State's comment amounted to "a misrepresentation of the consequences of a second degree verdict" by telling the jury that a second degree murder conviction would mean that defendant's conduct was "okay," and such a verdict was what he wanted. During the defense closing argument, defendant argued to the jury that his action of shooting Shelton and Miller was justified and his belief that such circumstances existed was either reasonable, because he was acting in self-defense, or unreasonable, necessitating a verdict of second-degree murder. Specifically, defendant argued that he pulled out his weapon after he heard Shelton threaten to "murk' him, and when he turned around, "he sees a number of things." He argued that he then saw Sanders lift his shirt with one hand, he saw Shelton turning and reaching for what he thought was a gun, and he saw Miller with one hand in his pocket. Defendant argued, "Nobody knew these people had guns. All this testimony about being unarmed just means they weren't showing the weapon. They weren't flashing it around. They had them in their pants. They had them in their jackets. They were armed. They were armed." Defendant suggested that the fact that no guns were found on the scene was because Sanders ran up the stairs, and "[h]e has plenty of time to get rid of the guns. The police don't come right away…he has plenty of time to go through the clothing and get out the guns and drugs and hide them."

¶ 85    In rebuttal, the prosecutor addressed defendant's argument by recapping some of the evidence that defendant relied upon in seeking the jury to find that his actions were justified, but his belief

was unreasonable. In doing so, the prosecutor argued that the actions of shooting someone in the back, shooting someone for something they said to you, for having a hand in a pants pocket, for adjusting their shirt, or when you do not see anyone with a gun, did not constitute proof of a mitigating factor of unreasonable belief in self-defense. It is proper for the prosecution to respond to arguments made by defense counsel. *People v. Johnson*, 208 Ill.2d 53, 113 (2003). We agree with the State's argument that the prosecutor was pointing out to the jury that if they found defendant guilty of second-degree murder, they would be ignoring and excusing the bulk of defendant's criminal culpability and that this evidence showed, instead, that he was guilty of first-degree murder. The jury heard all the testimony and viewed the videotape, as well as the still photographs from the videotape utilized by the defense, showing the encounter between defendant and the two victims in the lobby of the apartment building. The videotape and the other exhibits were not included in the record, so this Court is unable to see how defendant's testimony was or was not supported by this evidence.

¶ 86 Defendant contends that the use of the word "okay" misrepresented to the jury that a second-degree murder verdict would mean that defendant would not have any repercussions for his actions. In support, he analogizes these comments to the prosecutor's comments in *People v. Stack*, 44 Ill.App.3d 166, 177 (1st Dist. 1993). In *Stack*, the prosecutor "misrepresented the consequences of a NGRI verdict by telling the jury that it would allow the defendant to go free, when in fact it would have resulted in involuntary commitment." The comparison fails for several reasons.

¶ 87 In *Stack*, the court found that the improper comments "hammer[ed] home the idea that only the jury's guilty verdict stood between defendant being free to kill again and being free to kill again and being incarcerated." *Id*. at 171. As the court explained, "These types of comments could only play on an insanity jury's inherent fear that its verdict might set a dangerous man free." *Id*. at

172. Here, the prosecutor's comments did not reference whatsoever any possible sentence or punishments that defendant would face or suggest that a verdict of second-degree murder would set free a dangerous man.

¶ 88    Moreover, in *Stack*, the court found that the improper consequences of an NGRI verdict were so pervasive as to be "one of the State's themes in closing argument," while the prosecutor's comment was isolated. As previously stated, we look at the closing arguments in their entirety and overturn a guilty verdict only where the prosecutor's comments resulted in substantial prejudice. Improper comments alone will not warrant reversal unless they are a material factor in convicting the defendant. *People v. Woods*, 2011 IL App (1st) 091959, ¶ 42. On appeal, defendant does not challenge the propriety of any comments made by the prosecution during its closing argument. Where the prosecution properly outlined the necessary elements for first degree murder and second-degree murder, this isolated comment did not amount to a material factor in defendant's conviction.

¶ 89    Defendant also argues that the prosecutor seriously distorted the requirements of finding him guilty of second-degree murder and the appliable burden of proof. Defendant points to the prosecutor's comment, "This defendant is not justified in shooting these individuals. Do not compromise on the lesser charge of second degree and give him what he wants." The prosecutor was merely asking the jury to find defendant guilty of first degree murder because he was not justified in using the force that he used, and his actions did not amount to self-defense or to compromise and find him guilty of second degree murder.  The prosecutor's comment was not a distortion of the necessary elements for the offenses of first degree and second-degree murder.

¶ 90    Accordingly, we find that there was no error by the prosecutor's comment during rebuttal argument.

¶ 91                                    **III. Jury Note**

¶ 92        Defendant also asks this court to look at the jury's note, "Please define mitigating and please define preponderance of the evidence[,] suggesting that the trial court abused its discretion in its response to the jury's note that they had "received all of the instructions applicable in this case." Defendant suggests that the trial court should have re-read the instructions for first degree and second-degree murder to the jury and should have read the civil definition of "preponderance of the evidence" to the jury. Defendant also contends that the prosecutor's comment led to jury confusion as to the standard for perfect self-defense and imperfect self-defense.

¶ 93        The State contends that the trial court's response was appropriate where the jury already had the proper definitions of both phrases in the instructions, and the trial court was not required to re-read specific instructions that the jury had already been given. Regarding the definition of mitigation, the State contends that defendant waived his objection when he acquiesced to the trial court's response, and there was no difference between the civil and criminal definitions of "preponderance of the evidence." Moreover, the State contends that the trial court properly determined that the jury was not confused by the prosecution comments during rebuttal argument as well as the trial court's response to the jury's note.

¶ 94        It is well-established that a trial court must provide instruction when a jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion. *Id*. at 24 (citing *People v. Millsap*, 189 Ill.2d 155, 160 (2000). A trial court may, nevertheless, exercise its discretion to decline to answer a question form the jury under appropriate circumstances. *Millsap*, 189 Ill.2d at 161. Courts have found that appropriate circumstances include "when the jury instructions are readily understandable and sufficiently explain the relevant

law," as well as "when additional instructions would serve no useful purpose or may potentially mislead the jury." *Id.* (citing *People v. Reid*, 136 Ill.2d 27, 39 (1990)).

¶ 95     Here, the jury had already received explicit instructions on the definition of mitigating and preponderance of the evidence. The jury received Illinois Pattern Jury Instruction, Criminal, No. 7.05 (4th ed. 2000), which provided a definition for a mitigating factor as

> "A mitigating factor exists so as to reduce the offense of first-degree murder to the lesser offense of second-degree murder if at the time of the killing the defendant believes that circumstances exists which would justify the deadly force he uses, but his belief that such circumstances exists is unreasonable.

¶ 96     The jury also received Illinois Pattern Jury Instruction, Criminal, No. 7.06 (4th ed. 2000) (hereinafter IPI Criminal 7.06), which provided a definition of preponderance of the evidence as "more probably true than not…" The trial court determined that the written instructions answered the jury's question on clarifying these two concepts. The trial court, therefore, directed the jury to review the written instructions. We agree that the jury instructions were readily understandable and explained these concepts. The trial court's reference to the instructions should have been sufficient to clarify the issue for the jury. Accordingly, we conclude that the trial court did not err in answering the jury's question.

¶ 97     Regarding the State's argument that defendant acquiesced to the trial court's answer to the jury's question as to the definition of mitigating, the record does not support this claim. Defense counsel pointed out that the jury question "is nonsensical because for the purpose of this case mitigating factors defined in the instructions already[,]" and suggested that the trial court "either reinstruct them as to what the mitigating factor is or just say look at your instructions." Thus, defendant clearly suggested that the trial court re-read the applicable jury instruction.

¶ 98    Defendant, however, does not support his suggestion that the trial court should have re-read the instructions to the jury, as opposed to allowing them to read the jury instructions themselves, with any caselaw. We find no caselaw suggesting that a trial court would commit error in failing to re-read the jury instructions to the jury in lieu of the jury reading the instructions themselves. Obviously, the jury was able to read the jury instructions, and we find that having the trial court read the jury instructions to the jury for a second time would not have provided any further guidance to the jury or lessened any potential confusion that the jury may have had regarding these concepts.

¶ 99    Defendant also argues that the trial court abused its discretion when it failed to provide the civil definition of preponderance of the evidence. Illinois Pattern Jury Instruction, Civil, No. 21.01(2011) defines the phrase as, "more probably true than not true," which is identical to IPI Criminal 7.06. Here, the jury received IPI Criminal 7.06. Defendant does not explain how providing the very same definition for this phrase, contained in the civil patterned jury instruction, as opposed to the criminal patterned jury instruction, would have provided guidance or clarification to the jury.

¶ 100    We further reject defendant's argument that these jury questions revealed that the jury was confused by the comments by the prosecution during rebuttal argument. As we previously recognized, the prosecution and the defense both outlined the necessary elements for first degree murder, second degree murder, and self-defense, suggesting that there would not be any confusion by the jury. Notably, defendant argued during closing argument that explained preponderance of the evidence as, "[i]f you believe that you're in danger but you act unreasonably and that's proved by a preponderance, more likely than not, then that's a second degree."

¶ 101 We point out that, at the time that the jury submitted this question, defendant had the opportunity to argue that the jury's note suggested that they were confused by the comment made by the prosecution during rebuttal argument. He did not make this argument when the trial court was considering the appropriate response to the jury's question. Instead, defendant solely argued that the trial court should provide the civil definition of preponderance of the evidence. As to the definition of mitigation, defense counsel pointed out that "I think the question is nonsensical because for the purposes of this case mitigating factors [is] defined in the instructions already." As to the definition of "preponderance of the evidence[,]" the trial court found that the jury instructions already defined this standard, finding that "you must be persuaded considering all of the evidence in this case that it is more probably true than not true that the following mitigator is present."

¶ 102 We therefore reject defendant's argument that he was denied his right to a fair trial by the trial court's response to the jury's request for the definitions of mitigating and preponderance of the evidence. Consequently, the trial court properly exercised its discretion when it instructed the jury that they had already received all the instructions applicable in this case.

¶ 103                                        CONCLUSION

¶ 104 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 105 Affirmed.